Argued April 11, affirmed May 31, petition for rehearing
denied June 27, 1956

# STATE OF OREGON *v.* ANDERSON

298 P. 2d 195

*Robert L. Welch,* Lakeview, argued the cause for appellant. With him on the briefs was Herbert P. Welch, Lakeview.

*Charles E. Raymond,* special deputy District Attorney for Klamath County, Portland, argued the cause for respondent. With him on the brief was Richard C. Beesley, District Attorney for Klamath County, Klamath Falls.

Before WARNER, Chief Justice, and TOOZE, ROSSMAN, LUSK, BRAND and PERRY, Justices.

PERRY, J.

The defendant was indicted by the grand jury of Klamath county for the crime of murder in the first degree for the death of Richard Miller. He entered a plea of "not guilty." On motion of the defendant for a change of venue, the cause was transferred to Harney county. The defendant was convicted of murder in the second degree, and from this conviction he appeals.

There is some conflict in the testimony, but the evidence discloses these facts:

In the afternoon of November 4, 1954, Hazel Hecocta Robinson, Richard Miller (the deceased, hereinafter

referred to as "Miller"), and the defendant, together with other persons, were in Curley's Bar in Beatty, Klamath county, Oregon. When the bar closed at 11 p. m., Hazel, her brother Clifford, and Miller left the bar and drove to Hazel's home (generally known as the Hecocta house) in the latter's pickup. At the house they drank wine and beer, and danced to recorded music. After a time three girls, Shirley Foster, Rosetta Crane, and Winifred Anderson, accompanied by a Walter Garcia (also known as "Choppo" and "Crosby"), joined them. They all had more wine and dancing, Hazel dancing with Miller. Quite late that night, and after midnight, the defendant, accompanied by Wendell Brown, Don Barkley and Mary Barkley, his wife, joined the party. Walter Garcia attempted to introduce the defendant and Miller; there were some words, and Miller, in an attempt to strike the defendant, struck Garcia and Garcia knocked Miller down. Miller then left the Hecocta house in anger, and drove to his home where he armed himself with a knife, a revolver, and a shotgun; he then returned in his pickup truck to the Hecocta house where he stood in the road outside the house and fired the shotgun. Wendell Brown, Donald Barkley, Garcia, and the defendant ran outside; the girls stayed in the house. Garcia's testimony of what then occurred is as follows:

"Q When you four boys got out there, what did you do?

"A Walked up to the pickup.

\*    \*    \*    \*    \*

"Q Then where was Jim Anderson, Walter?

"A Standing right alongside of me.

"Q He was on the left?

"A He was on the same side we was.

"Q And was the truck between you and Anderson and Miller?

"A The truck was just between us and Miller.

"Q And Miller was where?

"A Standing on the other side of the pickup.

"Q Was he in the left lane of the traveled portion of the road?

"A Yes.

"Q Close to the pickup?

"A He was in the left lane, standing kind of in front of the pickup.

"Q About how far away from the pickup?

"A About ten feet.

"Q What?

"A About ten feet.

"Q What happened there?

"A Miller shot down the road, then he stood there and he said, 'Take one step closer and I'll shoot you.'

"Q Then what happened?

"A Then Jim says, 'Get your gun.' He says, 'We'll shoot him.'

\* \* \* \* \*

"Q When was it that Jim said, 'Get your gun and we'll shoot him?'

"A Right after Miller said, 'Take one step closer and I'll shoot you.'

"Q So what did you do?

"A When Miller fired the shot, I turned and run.

"Q Where did you run to?

"A Up to my sister's house to get a pistol.

\* \* \* \* \*

"Q When you got to your sister's house, what did you do?

"A Knocked on the window and told them to let me in, then I went around to the door.

"Q  Which door, the front door or back door?
"A  Back door.

"Q  And did she let you in?
"A  Yes.

"Q  And when you got in, what did you do?
"A  Got a pistol.

*    *    *    *    *

"Q  Then what did you do?
"A  Started running back down there towards the pickup.

"Q  How far down did you get?
"A  To the corner of the fence.

"Q  Do you mean the fence that is indicated in State's Exhibit 58?
"A  Yes.

"Q  When you got there, what happened?
"A  What happened?

"Q  Yes. What, if anything, did you see?
"A  Well, I stopped there when I seen Jim walk around the pickup with the shotgun.

"Q  You mean the defendant Anderson?
"A  Yes, sir.

"Q  And what did Anderson do with the shotgun?
"A  Walked around the pickup, climbed in the pickup, and shot down through the window.

"Q  Did you see him do that?
"A  Yes, sir.

*    *    *    *    *

"Q  Now, where the pickup was parked, were the lights on on the pickup?
"A  Yes.

"Q  Were the lights in the Hecocta house on?
"A  The front room, yes, sir.

"Q  Was the door open?
"A  Yes, when I left. I don't know if it was open just then.

"Q Was it open when you got back?

"A Yes, it was open when I got back.

\* \* \* \* \*

"Q All right. Then immediately following this shot, what did Anderson do?

"A Got down and got in the pickup and drove off.

"Q Which side of the pickup did he get down from?

"A Passenger side.

\* \* \* \* \*

"Q Did you see the pickup any more that evening, Walter?

"A No, not after it left.

"Q What?

"A Not after it left, then I didn't see it no more.

\* \* \* \* \*

"Q Did you go in the house?

"A Yes.

"Q Did you see Jimmy Anderson there then?

"A No.

\* \* \* \* \*

"Q \* \* \* What was the next thing that happened?

"A Jimmy come from up behind us someplace.

"Q You don't know where he came from?

"A No.

"Q About how long had you been standing there with Wentz before Jimmy came up?

"A We was standing there with Wentz before Jim came up.

"Q Yes, I know, but how long?

"A We was there 10 or 15 minutes, I guess.

"Q Then Jim came up?

"A Yes.

"Q  Well, did you talk to Jim?
"A  No.
"Q  Not at all?
"A  No.
"Q  Did you see how Jim acted?
"A  He was puffing a little bit."

The defendant's version of what occurred after Richard Miller returned to the Hecocta house is as follows:

"A * * * Somebody said, 'Somebody is shooting.' They didn't say 'at us', but 'Somebody is shooting.' When I got to the front room door was when I heard the second shot, which was the first shot that I heard. Crosby was going out the front, and I run right out behind him. Then Donald and Wendell Brown started behind us, but I don't know where they went from there, because they never did get up to the pickup * * *.

"Q  Where were you in relation to Miller's car or pickup when he said that?
"A  I was on the passenger side by the door.

"Q  Of the Miller car?
"A  Of the Miller pickup. Both of us was just about by the door, and we both kind of squatted down. When Crosby said, "It's that damn Miller kid again,—
* * * * *

"Q  All right. Go ahead.
"A  When we did get up to the side of the pickup, the Miller boy was standing on this off shoulder of the road, but slightly ahead of the pickup, standing across the road but just slightly in front of the pickup, where we could plainly see him, and we was by the door. That is when Crosby said, 'It's that damn Miller kid again.' Just as he said that, from where the Miller boy was standing he fired in this general direction, right across the hood of the pickup.

"Q In what direction?

"A Fired towards the pickup.

"Q In what direction in relation to you and Crosby?

"A Right at us, but above the pickup, above the hood of his pickup. If he had fired any lower he would probably have hit the pickup itself. We was squatting down here behind the door.

\* \* \* \* \*

"Q Did you tell him, 'go get your gun and we'll shoot him'?

"A No, sir. I didn't even know Crosby had a gun, because he was raised on the ranch there, and if he had had a gun I am sure I would have known about it, or some of the family would have. But he said he would go get his gun, and Crosby left. Just about the time he left, the Barkley car backed up and made a big wide swing in here and run off the barrow pit, as near as I can figure out, about in here (indicating), run off the side of the road, and the motor was racing. As soon as Crosby left, said he was going to get his gun, I didn't want to run across the opening here back to the house or anyplace else, so I squatted down behind there and looked under the pickup, you know. When I looked there, the Miller boy was just coming out of the lights, on the road, walking in this direction.

"Q What did he have in his hands?

"A Well, the last time I seen the boy he still had the shotgun in his hand, but I couldn't see then. I imagine he had his shotgun yet, because later on he had it. He started walking down the road, and I was squatting down here looking underneath the pickup, and I see Miller walk back here. Pretty quick he went out of sight, but I could still hear him moving on the road. This Barkley car is making an awful racket. I watched Miller walk down here, and pretty soon I can't see his feet but I can hear him. He winds up in here someplace, just about where Crosby has the back end of his pickup.

Miller was standing on this shoulder of the road, as near as I can remember, and when he come across the road, I laid down and rolled under the pickup. I laid under the pickup on my stomach, with my head towards the back wheel, where I could look out and watch the Barkley car and the Miller boy.

"Q Were you armed?

"A No, sir, I wasn't. That's why I wouldn't go across into the light. The doors were open and the lights come out here, but I don't think they come out near as far as Crosby said they did.

"Q What is your opinion about lights shining on the pickup?

"A I don't see how it possibly could. This is 41 feet. That room has one light bulb in the ceiling, as near as I can remember. The door was open, and the light does shine out here. Naturally it is more bright by the front door, and it dims out here. Right by the side of the pickup I can see the lights of the house, but they didn't shine directly on the pickup or cast enough light on it where you could recognize anybody's face. It may be possible that there is, I don't know, but I don't think so.

"Q All right. You have got Miller behind the pickup. Then what?

"A Standing here with the gun in his hand. He had the gun in his hand. I couldn't see the gun in his hand, but I thought he had it. The Barkley car is making a lot of racket. Then, just about that time, it came out of the ditch. As soon as it started to move away, Miller started back towards the passenger side of the pickup. When he got alongside of it, I don't know whether he heard me—I know he didn't see me, but he possibly heard me under there. He poked the barrel of the shotgun under the running board of the pickup * * * but I grabbed it and pushed it away.

"Q With which hand?

"A I imagine it would be my left hand. My head would be facing south, and I was laying on my

stomach. When he poked the gun under there and says, 'I've got one of you Indian bastards, anyway,' I grabbed the gun away. I pushed and he pulled, and all in one motion I came out from under the pickup. At that time I found myself with my feet under me, on the side of the road, on my feet, with Miller. Well, we wrestled over the gun. I mean, I tried to jerk it out of his hand and he naturally tried to jerk it out of my hands. We was into the barrow pit, into the back end of the pickup, against the pickup, all around, you know, because he was trying to take it away from me and I was trying to take it away from him. I tripped him a time or two, and he done the same to me. We had quite a struggle over the gun. My prints should be all over the gun from the way I handled it. We scuffled around there quite a little while, and I was just about to give up, but I knew darned well I couldn't. I figured any minute some of that crowd would come running up to help me. At least when they seen a couple guys struggling somebody would come up, I thought, but they didn't; at least I didn't see anybody. Well, I don't know how long we struggled back and forth with the gun, but all at once Miller turned loose of the gun and just released it, and I had it in my hand. Then he turned around and run around the front of the pickup. We was probably in the middle of the pickup someplace, or close there, on the passenger side. We wrestled back and forth, like I said, for quite a little while, and all at once he released the gun, just turned loose of it. When he turned loose of it, he went around the back of the pickup. I knew that he had the pistol on him and this hunting knife, because I had bumped into the hunting knife. In fact, I tried to get it once, and he tried it once, and he almost lost control of the shotgun when he attempted to grab it from the belt. I thought I had it that one time. That was when he reached down to his belt and just had one hand on the gun, and I thought I had it, but he come right back and grabbed the gun again. I don't know how much armament

he had on, or anything else, but I did know that the guy had the hunting knife. I tried to grab it one time and I couldn't; I mean I attempted to and missed it. He tried to grab it once, I remember, and just as he released the gun I thought I had it, but he grabbed it again. When he finally turned loose of the gun and run around the front of the pickup, I ran around the back of the pickup. He jumped into the cab, into the driver's side. When he done that, I don't know, I must have run against the pickup at that time. I don't know whether I did or not; probably did, because I tried to see what he was doing. He was in the pickup here, and I tried to see what he was doing in the pickup, you know, and tried to look through the back glass. I heard the motor. I don't know whether he started it, or the motor was running, but I heard it. Then I heard the gears clash as he tried to get his pickup in gear. I mean, you know, his motor was racing, and the gears made an awful racket, because it didn't go in gear right at that time. As soon as I seen that, I knew darned well that the guy was going home. Then I knew it was all over with and he was going home. I knew that if I had the gun, or something else, I would get it [sic] trouble and everybody else would get in trouble. The minute the pickup started, I throwed the gun in the back of the pickup and ran back to the side of the house. Right in here is where I stopped (indicating)."

The defendant then stated that after the pickup was driven away he went to the back porch of the house and saw the lights of the pickup go down the road; then he was gone about five minutes to the toilet and returned again to the house where he stayed that night.

The evidence is uncontradicted that the pickup truck, in which Miller was instantly killed, left the Hecocta house, traveled to the Paiute Road, then through a barrow pit and fence to a point on a logging

road on the Anderson property, a total distance of 1920 feet, where it was not visible from the main traveled roads in that vicinity. Miller's body was found outside of the cab on the ground beside the truck.

The defendant assigns as error the refusal of the trial court to give his requested instruction as follows:

"I instruct you to return a verdict of not guilty."

This instruction is the equivalent of a motion for a directed verdict.

Defendant's contention is that it was physically impossible for the witness Garcia to see what he claims he saw when testifying that the defendant fired the shot "down through the window" of the pickup. The impossibility is based upon the fact that Garcia had to observe the actions of the defendant at night from a distance of about 147 feet. It must be noted, however, that the lights of the truck were burning and there was an electric light burning in the Hecocta house which would shine through the open doorway toward Miller's pickup. Under these circumstances a court could not say as a matter of law that Garcia could not have seen and recognized the outline of the defendant and his actions.

■ We have carefully reviewed all of the evidence in this case, and, while it is conflicting, we are satisfied the trial court did not err in submitting the question of the guilt of the defendant for determination by the jury.

The defendant contends (1) the trial court was in error in permitting the introduction of any evidence in this cause; and (2) in its failure to grant his motion for discharge at the conclusion of the selection of the jury.

The basis of each contention is that, since no appearance was entered by the district attorney of Harney

county, the district attorney of Klamath county and his duly appointed special deputy were without authority in law to proceed with the prosecution of the cause after the change of venue to Harney county was granted by the circuit court of Klamath county.

There can be no question, as contended by the defendant, but that, when a change of venue has been granted and the cause assigned and transferred, the court granting the change of venue loses jurisdiction over the trial of the cause. It is stated in 56 Am Jur 79, Venue § 78:

"A change of venue not only absolutely divests the court from which the cause was removed of jurisdiction, but it also clothes the court to which removal is had with the same jurisdiction that reposed prior to the change in the court of original venue."

The above statement illustrates the fact that the matter of the jurisdiction of the court on a change of venue refers solely to the authority of the court to try the cause, and will not aid us in determining the territorial jurisdiction of a district attorney.

The defendant cites and relies upon the following statement from 27 CJS 396, District and Prosecuting Attorneys § 12 (2):

"*On a change of venue* the duty to represent the state devolves on the prosecuting attorney of the county to which the cause is removed." (Italics theirs)

The authority for this statement is *Bevington v. Woodbury County,* 107 Iowa 424, 78 NW 222. A study of this case discloses that its foundation rests upon interpretation of the statutory law of that state as it then

existed. The section cited in 27 CJS, supra, also states as a headnote:

> "The power and duty of a district or prosecuting attorney to appear in courts outside his particular district is generally controlled by applicable provisions of statute or constitution and the practice differs. The right of a prosecutor to appear outside his district should be questioned directly and not collaterally."

See, also, *State v. Carothers,* 1 Greene (Iowa) 464; *People v. Neff,* 191 NY 286, 84 NE 63.

A study of the cases above cited, and others, leads us to conclude that the solution of the question lies in the interpretation of our own statutes governing the duties of district attorneys.

■ We might properly terminate at this juncture the defendant's contentions by applying the correct rule of law applicable to this situation; that is, the defendant cannot attack the right of the district attorney of Klamath county to conduct the State's prosecution against him in Harney county collaterally, but must proceed directly to test his authority to act. *State ex rel. Madden v. Crawford,* 207 Or 76, 295 P2d 174; *State v. Brumfield,* 104 Or 506, 209 P 120. However, since the matter is one of public interest, we will examine the pertinent constitutional and statutory provisions of this jurisdiction.

The original Article VII, § 17, of our constitution reads as follows:

> "There shall be elected by districts comprised of one, or more counties, a sufficient number of prosecuting Attorneys, who shall be the law officers of the State, and of the counties within their respective districts, and shall perform such duties pertaining to the administration of Law, and general police as the Legislative Assembly may direct."

The provisions therein remain in force, notwithstanding the amendment of Article VII in 1910, except where modified by legislative enactment. *State ex rel. v. Farrell*, 175 Or 87, 92, 151 P2d 636.

Statutory enactments setting forth the duties of district attorneys are as follows:

ORS 8.650: "The district attorney in each county is the public prosecutor therein."

ORS 8.660: "The district attorney shall attend the terms of all courts having jurisdiction of public offenses within his county, and conduct, on behalf of the state, all prosecutions for such offenses therein."

ORS 8.670: "The district attorney shall institute proceedings before magistrates for the arrest of persons charged with or reasonably suspected of public offenses, when he has information that any such offense has been committed, and attend upon and advise the grand jury when required."

ORS 8.680: "The district attorney shall prosecute for all penalties and forfeitures to the state that may be incurred in his county, and for which no other mode of prosecution and collection is expressly provided by statute, and in like case, prosecute or defend all actions, suits and proceedings in his county to which the state is a party."

ORS 8.690: "The district attorney and his deputies shall advise the county court, county school superintendent, county clerk, sheriff, county assessor, and county surveyor on all legal questions that may arise. When any action is instituted against any such officer or other county employe for damages for alleged wrongful act or omission in the performance of his official duty, the district attorney shall defend such action. He shall also prosecute and defend all actions, suits, and proceedings to which the county may be a party. For such services he shall receive no compensation other than his salary."

ORS 8.650, 8.660, and 8.670, carefully set forth a district attorney's duties involving criminal matters, while ORS 8.680 and 8.690 prescribe the duties of the office as they pertain to the civil business of the state and county within his district.

The pertinent statutes relating to a change of venue are as follows:

> ORS 131.430: ''When the place of trial has been changed, the clerk shall forthwith transmit to the clerk of the proper court a transcript of the proceedings in such cause with all the original papers filed therein, having first made out and filed in his own office authenticated copies of all such original papers. Such transcript and papers may be transmitted by mail or by the hands of some suitable person appointed by the court or judge thereof.''

> ORS 131.440: ''Upon the filing of the transcript and papers with the clerk of the court to which the cause is transferred, the change of the place of trial is complete and thereafter the action shall proceed as though it had been commenced in that court.''

> ORS 131.450: ''The expenses of the change of the place of trial shall be taxed as expenses of the action, and the costs and expenses of the action shall be taxed in the court and paid by the county wherein the trial is had; but if such costs and expenses are not recovered of the defendant in the action, they shall be repaid to such county by the county wherein the action was commenced.''

■ The general rule is to the effect that ''the powers and duties of prosecuting attorneys are ordinarily confined to their respective counties or districts in the absence of any statute extending their territorial jurisdiction.'' 42 Am Jur 241, Prosecuting Attorneys § 9.

It follows, therefore, that if the territorial juris-

diction of a district attorney is extended, the enlargement must be found in the statutory law above set out.

It appears without contradiction under the statutes cited that the district attorney has sole charge within the district for which he is elected of the prosecution of all crimes committed within its territorial boundaries.

The defendant emphasizes the words "within his county" and "therein" in ORS 8.660, contending these words refer to and require only his attendance upon and prosecution of matters in the courts having jurisdiction of public offenses within his county.

We do not believe this is the correct construction of the statute. It is clear that, in enacting the statutes pertaining to the duties of district attorneys, the legislature was considering the general and usual duties of district attorneys within their territorial jurisdiction, and, in speaking of the courts having jurisdiction of public offenses, it was speaking of the jurisdiction of the court which arises by reason of the public offense having been committed within its territorial jurisdiction, and the statute is concerned with the duties of a district attorney relative to crimes committed within the territorial jurisdiction of the district attorney and enjoins upon him the duty of carrying on the prosecution of these offenses. This is shown by these facts: Article I, § 11, of the Oregon Constitution, enacted in 1859, and unaffected by the amendments of 1932 and 1934, guaranteed to a person charged with a crime the right of trial in the county in which the offense was committed. The duties of district attorneys under the statutes here considered were enacted by the legislature in 1862, and at a time when there was no statutory provision for a change of venue; it was not until

1864 that the legislature provided for a change of venue in criminal actions.

■ The constitution and legislative acts having charged the district attorneys with the duty of prosecuting all public offenses committed within their jurisdiction, the conclusion must be drawn that their duty continues until the action is terminated, unless they are relieved by some other provision of statutory law.

We find nothing in the statutes providing for a change of venue that in anywise pertains to the duties of district attorneys; and we find nothing elsewhere that relieves them of this duty imposed upon them by law.

The defendant relies heavily upon *State ex rel. v. Farrell,* supra, written by Mr. Justice LUSK; there is language in the opinion which, when withdrawn from the context and the question involved, affords some comfort to the defendant, but the court there was considering the territorial duties of a district attorney in the commencement of a suit beyond the boundaries of his district, and not the territorial duties of a district attorney as they refer to suits or actions rightfully commenced within the territorial jurisdiction of his district.

■ We can reach no other reasonable conclusion than that it is the duty of the district attorney upon a change of venue to follow the cause to the place of change. This view expressed conforms, we believe, with the general practice in the past in such matters, and, also, we believe, with a practice best calculated to subserve the public interest. The district attorney of the county in which the indictment is found must of necessity be more familiar with the facts upon which the indictment is returned, and, therefore, he is best equipped to secure and present the evidence against an accused.

694

The defendant requested instructions upon justifiable homicide, which request was refused, and no instructions were given upon this phase of the law. The defendant contends the trial court erred.

■ In 26 Am Jur 540, Homicide § 549, it is stated:

"Whether it is the duty of the court in a prosecution for homicide to instruct the jury on the question of self-defense when the defendant denies the killing seems to depend entirely upon the nature of the evidence introduced at the trial. If the defendant denies the killing and there is no evidence adduced by either party which tends to show that the killing might have been in self-defense, although other evidence shows quite conclusively that the defendant committed the crime, it is not the duty of the court to instruct as to self-defense; but if the evidence tends to raise the issue of self-defense although the defendant denies the killing, it seems that an instruction based on the theory of self-defense may be given. The defendant's denial of the act does not necessarily warrant the trial court in refusing to give an instruction based on the theory of self-defense."

The general rule there stated is the rule of this state. *State v. Steidel,* 98 Or 681, 194 P 854.

Since the state of the evidence is the controlling factor in whether or not instructions on self-defense should be given, we must be governed by what the law requires shall appear in the evidence to invoke this defense in homicide actions. So far as is applicable to the matter before us, ORS 163.100 provides:

"The killing of a human being is justifiable when committed:

\* \* \* \* \*

(2) by any person: (a) to prevent the commission of a felony upon him, \* \* \*."

And in *State v. Radar,* 94 Or 432, 456, 186 P 79, we stated:

"* * * It is imminent danger, real or apparent, of great bodily harm to himself which justifies a defendant in protecting himself."

■ Therefore, whether or not the defendant denies the homicide, a court should instruct a jury on the law of self-defense of the person whenever there are facts in the case from which a jury might draw the conclusion that at the time the act of homicide was committed the defendant could reasonably believe his person was in imminent danger of great bodily harm.

The defendant argues that the following facts are sufficient for this purpose: Richard Miller, the deceased, together with one Garcia and several girls, was attending a drinking party at the home of Hazel Hecocta Robinson near Beatty, Oregon, on the evening of November 4, 1954. The defendant, who had been drinking in Bly, Oregon, went to the Hecocta house, and upon arrival Garcia undertook to introduce the defendant to Miller. When the introduction was made an argument ensued, Garcia struck Miller, inflicting certain injuries about his mouth. Thereupon, Miller left the Hecocta house and went approximately five miles to his home where he armed himself with a shotgun, and shells, a .45 caliber revolver, a hunting axe, and a knife; he was very angry with Anderson at this time, and he returned to the Hecocta house. After Miller returned to the Hecocta house he fired the shotgun and the defendant and others came out of the house, and Miller fired the shotgun in the general direction of the house at the defendant and Garcia. The others left, but defendant, being afraid of being shot as he left, because of the lights about, crawled under the pickup truck belonging to Miller. Miller discovered

the defendant under the pickup and poking the shotgun under the running board said, "I've got one of you Indian bastards anyway." The defendant grabbed the barrel of the gun, got out from under the pickup and managed to take the gun from Miller. During this struggle the defendant learned of the pistol and knife, in addition to the shotgun, in Miller's possession, as Miller had tried to "grab" them during the scuffle for possession of the shotgun. After defendant got possession of the shotgun, Miller ran around the side of the pickup and got inside, being still armed.

The defendant, however, fails to consider the fact that Miller, while seated in his pickup truck, was killed by shotgun fire into his back at close range through the rear window of his pickup truck, and that defendant testified as follows:

"When he finally turned loose of the gun and run around the front of the pickup, I ran around the back of the pickup. He jumped into the cab, into the driver's side. When he done that, I don't know, I must have run against the pickup at that time. I don't know whether I did or not; probably did, because I tried to see what he was doing. He was in the pickup here, and I tried to see what he was doing in the pickup, you know, and tried to look through the back glass. I heard the motor. I don't know whether he started it, or the motor was running, but I heard it. Then I heard the gears clash as he tried to get his pickup in gear. I mean, you know, his motor was racing, and the gears made an awful racket, because it didn't go in gear right at that time. As soon as I seen that, I knew darned well that the guy was going home. Then I knew it was all over with and he was going home. I knew that if I had the gun, or something else, I would get it [sic] trouble and everybody else would get in trouble. The minute the pickup started, I throwed the gun in the back of the pickup and ran back to the

side of the house. Right in here is where I stopped (indicating)."

The defendant relies upon *State v. Way,* 120 Or 134, 249 P 1045, 251 P 761, and *State v. Steidel,* 98 Or 681, 194 P 854, and particularly upon our statement in the latter case. Speaking through Mr. Justice BURNETT, we said at page 688:

"Self-defense is not necessarily based upon actual combat between the defendant and the individual producing the situation of danger which he would quell. Nor is it requisite to show that the one creating the situation of danger had an intention thereby to commit a crime. A toddling child, incapable of forming a criminal intent, might make it very dangerous for a bystander, if armed with a loaded pistol. It would be unreasonable to say that the bystander could not act in self-defense and disarm the child. So, in the present juncture, if the policeman, not known as such to the defendant, was recklessly firing his pistol, under conditions outlined in Section 1898, Or. L., supra, the defendant would have a right to take reasonable means to avert the danger to himself or the other bystanders in like peril."

This statement is authority for the proposition that it is not necessary to show in a given situation the felonious intent of a party who creates a situation which may be dangerous to those about him. But it is not authority for the statement that the defendant need not show he was apprehensive of a felonious act against himself, or others. In the cases relied upon by defendant, the rule is that to justify his actions there must be shown a state of facts from which a jury may draw a conclusion that reasonable apprehension of danger existed in the mind of a defendant.

■ In this case there is a total lack of facts from which a jury could draw an inference that at the time

Richard Miller was killed the defendant was taking any justifiable steps to avert any real or apparent danger to himself or anyone else. From the defendant's own lips we are informed that all danger was past when he obtained Miller's shotgun and the truck started to leave the Hecocta house.

The trial court did not err in refusing to instruct the jury upon self-defense as an issue.

The defendant assigns as error the refusal of the trial court to give the following requested instruction:

"In weighing the testimony of the defendant and in determining his guilt or innocence, it is proper for you to consider the fact, if you believe it to be a fact, that the defendant did not attempt to flee."

■ The trial court did instruct the jury upon the presumption of innocence, which attaches to all defendants in criminal cases. The requested instruction would be no more than a comment upon the evidence, and would have been error. The requested instruction is far different from its converse, which permits, by reason of a rule of law of long standing, a jury to consider flight as a consciousness of the guilt of the defendant to aid in overcoming the presumption of innocence which surrounds the defendant.

In the course of the trial the following occurred:

"THE COURT: Ladies and Gentlemen, before we begin to take any testimony this morning, it has been called to my attention that the jury has been buying and reading the newspapers, and some of the newspapers have contained some articles regarding this case. If you have read any of those articles, Ladies and Gentlemen, of course that is almost equal to discussing the matter with someone else. Have any of you ladies and gentlemen read any

of those articles? (Some jurors answered in the affirmative)

"THE COURT: The next question I want to ask you at this time is, have any of you been influenced in any way in this case by any articles that you have read in the newspapers? (Eleven jurors answered in the negative).

"THE COURT: Mr. McCulloch, what about you?

"MR. McCULLOCH: I didn't read them, sir. I passed them up.

"THE COURT: Let me say to you Ladies and Gentlemen, I must either keep the newspaper away from you, or I must admonish you not to read the papers. Now, I don't know what might appear in the papers in this case. I don't know what conclusion you might have arrived at from any of the articles, but from now on I admonish you not to read any of the articles in there. If you do that, then it will be necessary for me to refuse to let you have any newspapers. There has been some objection raised in this case on account of that.

"Now, it is going to be almost impossible to censor all of the papers and have some person read them through and take out the articles, clip the papers, I asked the bailiff if he would do that, and he wouldn't assume the responsibility, so I ask you not to read any of those articles pertaining to this trial at all. Will you agree to do that, Ladies and Gentlemen? (All of the jurors answered in the affirmative.)"

The defendant states the trial court therein committed error because:

"It is to be noted that the court did not in any manner whatsoever instruct the jury members who had read the articles that they should lay aside any and all impressions gained therefrom and decide the matter wholly upon the evidence offered in court."

ORS 17.505 provides:

"An exception is an objection taken at the trial to a decision upon matter of law, whether the trial is by jury or court, and whether the decision is made during the formation of a jury, or in the admission of evidence, or in the charge to the jury, or at any other time from the calling of the action for trial to the rendering of the verdict or decision. No exception shall be regarded on a motion for a new trial, or on an appeal, unless the exception is material and affects the substantial rights of the parties."

ORS 17.510 provides:

"No instruction given to a jury in the circuit court shall be subject to review upon appeal unless its error, if any, was pointed out to the judge who gave it and unless a notation of an exception was made in the circuit court. It shall be unnecessary to note an exception in the circuit court to any other ruling made. All adverse rulings except those contained in instructions given shall import an exception in favor of the party against whom the ruling was made."

The word "instruction" as used in the statute is not limited to the charge to the jury, but applies to all directions given the jury as to their conduct in the course of the trial. Therefore, the failure of the defendant to except thereto precludes our consideration of the matter, unless we can say that the record considered in its entirety shows that the defendant did not have such a trial as is contemplated by law. *State v. Bouse*, 199 Or 676, 264 P2d 800.

We are of the opinion, gathered from the entire record, that the jurors were cognizant of the fact, not only from what occurred at this time, but also when

examined on their voir dire, that they were to try the case upon the evidence lawfully submitted in the court for their consideration, and not upon the newspaper reports, and no prejudice to the rights of the defendant resulted.

The judgment of the trial court is affirmed.