James Quinten **ANDERSON**, Petitioner,

v.

**C. T. GLADDEN**, Warden of the Oregon State Penitentiary, Respondent.

Civ. No. 65-224.

United States District Court
D. Oregon.

June 5, 1967.

Louise Jayne, Portland, Or., for petitioner.

Robert Y. Thornton, Atty.Gen. of Oregon, David H. Blunt, Asst.Atty.Gen., Salem, Or., for respondent.

## OPINION

SOLOMON, Chief Judge:

James Quinten Anderson, a Klamath Indian, is serving a life sentence for second degree murder. In his habeas corpus petition in this Court he seeks to set aside his conviction.

On the morning of November 5, 1954, Richard Miller was shot in the back by a shotgun fired at close range. He died instantly. There was evidence that the murderer stood on the bed of Miller's pickup truck and shot through the back window, then walked around the truck, climbed in the cab, and drove Miller's truck away.

The Klamath County Grand Jury indicted Anderson for first degree murder. Since the shooting and pending trial attracted much attention in Klamath Falls, Judge Vandenberg granted Anderson's motion for a change of venue and transferred the trial to Harney County, 250 miles away.

A jury found Anderson guilty of second degree murder, and the Oregon Supreme Court affirmed, State v. Anderson, 207 Or. 675, 298 P.2d 195, 60 A.L.R. 2d 850 (1956). Since his trial, Anderson has tested the validity of his confinement many times.[1] He now asserts the following specifications of error:

1. The prosecutor suppressed evidence helpful to Anderson.

2. The prosecutor made an improper argument.

3. The prosecutor knowingly used perjured testimony.

4. The jurors had available to them inflammatory and prejudicial magazine and newspaper publicity.

5. Indians were excluded from the Harney County Petit Jury.

6. Indians were excluded from the Klamath County Grand Jury.

## SUPPRESSION OF EVIDENCE

Walter Garcia was the prosecution's principal witness. Anderson alleges that police and sheriff's officers improperly allowed Garcia to dispose of his shirtsleeves and blacken his boots, all of which were bloodstained. Anderson also alleges that the District Attorney suppressed evidence of footprints made by someone running from the scene of the crime near the time of the shooting.

The evidence fails to support Anderson's allegations. In a hearing before me, a lawyer who defended Anderson testified that he and the two other defense counsel knew of the footprints but did not believe them important. They also knew about the shirt and boots, and cross-examined Garcia extensively on his reasons for changing their appearance.

There is no evidence that the prosecution attempted to suppress this or any other evidence.

1. Anderson v. Britton, 212 Or. 1, 318 P.2d 291 (1957); cert. denied 356 U.S. 962, 78 S.Ct. 999, 2 L.Ed.2d 1068 (1958); Anderson v. Gladden, 9 Cir. 1961, 293 F.2d 463, cert. denied 368 U.S. 949, 82 S.Ct. 390, 7 L.Ed.2d 344 (1961); Anderson v. Gladden, 234 Or. 614, 383 P.2d 986 (1963), cert. denied 375 U.S. 975, 84 S.Ct. 485, 11 L.Ed.2d 420 (1964).

## IMPROPER ARGUMENT

■ At the trial, the prosecutor argued to the jury that Anderson's unwillingness to give a statement to the police was evidence of his guilt. Anderson claims this argument violated his Fifth Amendment right against self-incrimination. He cites Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), to support his contention.

*Griffin* holds that the prosecutor may not comment to the jury on a defendant's failure to testify on his own behalf. The Supreme Court stated that such comments limited the accused's right against self-incrimination by making it costly to exercise. Although this reasoning also applies to a defendant in Anderson's position, *Griffin* does not apply to persons convicted before its April 28, 1965, decision date. Tehan v. United States ex rel Shott, 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966). Anderson is therefore not entitled to relief based on the prosecutor's comment.

## PROSECUTION'S KNOWING USE OF PERJURED TESTIMONY

■ At Anderson's trial Walter Garcia testified that he saw Anderson shoot Miller through the back window of the truck. On June 19, 1959, Anderson's lawyer took from Garcia an affidavit in which Garcia swore that he did not see Anderson shoot Miller and did not know who shot him. Later that day, an attorney for the State obtained from Garcia an affidavit which contradicts the first affidavit. In the second affidavit, Garcia swore that his testimony at the trial was true, that he did see Anderson fire the shotgun through the truck's rear window. Garcia explained that in the affidavit given early that day he swore that he did not see Miller get shot because he was unable to see Miller in the cab of the truck.

Since his trial Anderson has obtained five other affidavits which are now in evidence. Two of the affiants, Ethel Mae Lugo and Geraldine Kirk, swore that Walter Garcia told them he killed Miller. Two others, Wendel Brown and Perry Chocktoot, swore that Anderson could not have killed Miller because he returned to the nearby Hecocta house with them immediately after the shooting. The person who shot Miller got in the truck and drove away.

Anderson contends that the post-trial affidavits prove that Garcia gave false testimony at the trial. I disagree. At most, they show that Garcia lied either when he testified or when he gave his affidavit to Anderson's lawyer. The jury apparently believed Garcia's testimony in spite of three other witnesses who testified that Garcia told them he killed Miller.

Since four of the five affiants were witnesses at the trial, the affidavits do not present newly discovered evidence that could not have been discovered by the exercise of reasonable diligence before the trial. Pitts v. United States, 9 Cir. 1959, 263 F.2d 808. Neither do they show that the prosecution knowingly used false testimony, which Anderson must show to obtain habeas corpus relief. United States ex rel. Smith v. Reincke, 2 Cir. 1965, 354 F.2d 418; London v. Oklahoma, 10 Cir. 1957, 248 F.2d 788.

## AVAILABILITY OF PREJUDICIAL MAGAZINE AND NEWSPAPER PUBLICITY

■ The Miller shooting received extensive press coverage throughout Oregon, particularly in Klamath County. It was so well publicized that in Burns, where the trial was held, only one of thirty-three prospective jurors questioned on voir dire had not read or heard about the case.

The jury was kept together throughout the trial. Jurors were allowed to buy newspapers and magazines, but were warned not to read stories about the trial.

While the trial was in progress the May, 1955, issue of Headquarters Detective magazine went on sale in Burns.

That issue contained an article about Anderson, entitled "Kid Tomahawk." Unlike newspaper stories appearing during the trial, which were generally not prejudicial,[2] the "Kid Tomahawk" article was highly inflammatory and contained many false and misleading statements and allegations.

Anderson contends that the availability of this article and the extensive press coverage deprived him of a fair trial.

The fact that most of the prospective jurors in Burns had heard or read about the Miller shooting did not deprive Anderson of a constitutional trial. As the Supreme Court wrote in Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961):

> "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." 366 U.S. at 723, 81 S.Ct., at 1642–1643.

Eleven of the twelve veniremen chosen as jurors said they had no opinion about Anderson's guilt or innocence before the trial began. The twelfth juror, Henry Otley, admitted he had an opinion but stated he could lay it aside and decide on the basis of the evidence. If Anderson's lawyers thought that Juror Otley was unsatisfactory, they could have challenged him peremptorily. Instead they accepted the jury without exhausting their challenges.

Anderson is not required to demonstrate that identifiable prejudice resulted from the press coverage of the trial. It is enough if he shows that prejudice was inherent in the circumstances of his case. Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965).

Neither side used the press rather than the courtroom to present its case. Anderson's trial did not take place in the "carnival atmosphere" condemned in Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), and evident from the courtroom presence of television crews in Estes, supra.

The newspaper stories were factual reports of the trial, but the "Kid Tomahawk" article is full of falsehoods and half-truths. If the jurors had seen it, this article alone might be sufficient to require a new trial.

The jurors were kept together in the custody of the bailiffs throughout the trial. The bailiffs attempted to prevent jurors from reading accounts of the trial. Anderson's former lawyer testified that he did not discover the article until near the end of the trial, but he later interviewed the bailiffs and many of the jurors to learn whether any juror had read the article. He was unable to find any juror who had either seen the article or the magazine in which it appeared.

The newspaper coverage of Anderson's trial did not violate standards of due process. The mere publication of the "Kid Tomahawk" article during the trial, without a showing that at least one juror read the article, is insufficient to require the setting aside of the jury's verdict.

## EXCLUSION OF INDIANS FROM GRAND AND PETIT JURIES

■ Anderson's remaining specifications of error allege systematic exclusion of Indians from the Klamath County Grand Jury and the Harney County Petit Jury. If he can show ex-

2. Stories in The Oregonian, which was available daily in Burns, suggested that Anderson might not be guilty. Lyle Downing, who reported the trial, wrote:

"Counsel for the defense, in the opinion of Court observers, has succeeded in creating a strong element of doubt as to whether the real killer is on trial." (Feb. 25, 1955, The Oregonian)

clusion, his conviction must be set aside. Eubanks v. Louisiana, 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed.2d 991 (1958); Cassell v. Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950). Although Anderson failed to object to the composition of either panel, failure to object to exclusion of Indians will not prevent him from asserting the exclusion as a ground for habeas corpus if the exclusion was not readily apparent when the objection should have been made. United States ex rel Seals v. Wiman, 304 F.2d 53 (5 Cir. 1962). The percentage of Indians in Klamath and Harney Counties is small enough so that the absence of Indians from his jury panels would not have warned Anderson of the exclusion. He may therefore raise that issue now.

There were 2,894 registered voters in Harney County in 1954, of which forty to fifty were Indians. Mrs. Crump, a Harney County employee from 1951 to 1957, testified that she helped the County Clerk select the master jury list each year, and that Indians were selected on the same basis as other voters. In 1955 two of the 222 people on the master list were Indians. Where approximately 1½ per cent of the registered voters[3] are Indians, no master list can be expected to include many Indians, and years without any Indians on the list would be neither unusual nor illegal.

Each year the panel was drawn from the master list. Sheriff Sitz, who has participated in the drawing since 1945, testified that jurors were excluded only if physically unable to serve, or if extreme travel distance made jury service burdensome.[4] Sheriff Sitz stated that Indians were never excluded, but that few Indians in Harney County registered to vote before 1955.

■ Anderson failed to prove that Indians were excluded from Harney County juries.

Anderson alleged that Indians were systematically excluded from the Klamath County Grand Jury and contends that his indictment and conviction are therefore void. His Exhibit 12 contains the names of all persons serving as Grand Jurors in Klamath County between 1937 and 1956. Anderson testified that he compared this list with the roll of members of the Klamath Indian Tribe living on August 13, 1954, and he found that none of the 132 persons on the Grand Jury list were members of the Klamath Tribe. Anderson alleges that the tribal roll listed 589 Klamath Indians of voting age in 1954.

Exclusion of members of a defendant's race from the Grand Jury voids a conviction, even though the petit jury was legally composed. Cassell v. Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950). Anderson asserts that the absence of Indians from every Grand Jury between 1937 and 1956 establishes a prima facie showing of exclusion because of race. Patton v. Mississippi, 332 U.S. 463, 68 S.Ct. 184, 92 L.Ed. 76 (1947). But in *Patton*, no Negro had served on a Lauderdale County Grand or Petit Jury for more than 30 years, although 36 per cent of the County's adult population were Negroes.

Anderson's evidence is far from conclusive. Although ORS 10.110 provides that jurors be chosen from voter registration lists or tax rolls, he has not shown whether any Klamath Indians were registered voters or property owners. If 589 adult Indians lived in Klamath County in 1954, they probably constituted 2 per cent of the county's adult population.[5] The percentage of

3. There was testimony that in 1955 approximately 200 of Harney County's 6,-500 people, or 3 per cent, were Indians. Anderson presented no evidence of Indians eligible to vote but unregistered.

4. Burns, the county seat, is more than 100 miles from the south end of the county.

5. The Oregon Blue Book for the year 1955 gives the 1950 census figures of 42,150 for the total population of Klamath County, and the 1958 Blue Book shows the estimated population to be 43,390.

registered voters was probably much smaller.

Anderson did not present evidence on Klamath County's method of selecting Grand Jurors, nor did he submit any master list from which Grand Jurors were chosen. The list he did present contains 132 names [6] and includes all persons who served as Grand Jurors between 1937 and 1956. Anderson's showing of exclusion is limited to his own testimony that there were no Indians on the list and his conclusion that on the basis of mathematical probability the list should have included two Indians. This alone does not prove denial of equal protection.

I have considered all other contentions and subcontentions in Anderson's petition, and find them without merit.

The petition for a writ of habeas corpus is denied.

---

6. The Grand Jury that indicted Anderson had six members; eighteen others between 1937 and 1956 had seven.