James Edward HAYTON, Petitioner,

v.

Charles EGELER, Warden, State Prison of Southern Michigan, Respondent.

Civ. A. No. 40334.

United States District Court,
E. D. Michigan, S. D.

Dec. 8, 1975.

Stuart M. Israel, Columbus, Ohio, for petitioner.

Frank J. Kelley, Atty. Gen., A. Michael Leffler, Keith D. Roberts, Asst. Attys. Gen., Lansing, Mich., for respondent.

OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND GRANTING RESPONDENT'S MOTION TO DISMISS

CORNELIA G. KENNEDY, District Judge.

Petitioner is presently serving a life sentence imposed by the Livingston County, Michigan, Circuit Court on June 26, 1968, following his conviction for first degree murder in the killing of a

Hamburg (Livingston County), Michigan drug store owner during a robbery.[1] He filed the instant habeas corpus action *pro se* and in forma pauperis. The complex and serious nature of the constitutional issues raised required that counsel be appointed. The director of the Michigan Inmate Assistance Program, a faculty supervised, student program at the University of Michigan Law School, accepted appointment as counsel and an Amended Petition for Writ of Habeas Corpus was filed on petitioner's behalf on June 24, 1974.[2]

This petition raises the following constitutional challenges to petitioner's conviction:

I.    That intense, localized publicity, including inaccurate and inadmissible information about petitioner saturated the trial community and influenced the courtroom proceedings, thereby denying petitioner his right to a fair trial by an impartial jury when his motions for change of venue, separate trials, and mistrial were denied;

II.   That since the adverse pretrial publicity did not abate, the failure of the state to preserve any record of the voir dire examination, the ruling on the motion for change of venue, and the ruling on the motion for separate trials denied the petitioner a record from which to demonstrate fully the foregoing claim and thereby deprived him of the due process of law.

III.  That petitioner was unconstitutionally penalized for exercising his privilege against self-incrimination when both the prosecutor and co-defendant's counsel revealed to the jury that he had exercised that privilege while in police custody prior to trial;

IV.   That petitioner was denied the due process of law when testimony was taken while he was absent from the courtroom even though he never waived his right to be present and confronted with all the evidence;

V.    That the totality of misconduct during trial by prosecuting authorities deprived petitioner of his right to a fair trial by an impartial jury upon properly admitted evidence.

Petitioner has exhausted his state remedies. Following his trial (which lasted from June 3 to June 13, 1968) his retained trial counsel filed an appeal on his behalf. This appeal raised primarily state law issues. The conviction was affirmed by the Michigan Court of Appeals. *People v. Hayton*, 28 Mich.App. 673, 184 N.W.2d 755 (1970). The Michigan Supreme Court denied without opinion the application for leave to appeal on April 13, 1971.

Petitioner, *pro se,* then filed on June 2, 1971, a "Motion to Vacate and Set Aside Judgment and Sentence" in the Livingston County Circuit Court, supported by a brief that unartfully but sufficiently raised the claims he asserts here. A hearing was held on this motion before the trial judge's successor at which petitioner appeared without counsel. The motion was denied. Petitioner applied to the Michigan Court of Appeals for leave to appeal this decision. This relief was denied without opinion on September 23, 1971. Application to the Michigan Supreme Court for leave to appeal was denied without opinion on December 14, 1971.

## I.   EXISTENCE OF PREJUDICIAL PRETRIAL PUBLICITY

The first two claims of petitioner both relate to pretrial publicity and are inex-

---

1. Petitioner is also serving sentence of 2 to 55 years for a Michigan armed robbery conviction. That sentence is not challenged here.

2. The Court wishes to express its appreciation of the services of the appointed counsel, Mr. Stuart Israel, and of Mr. William Street, a student at the University of Michigan Law School who assisted counsel in the preparation of this case. Their written and oral arguments were of great assistance to the Court's analysis of the legal issues presented by this action.

tricably interwoven. The nature and extent of this publicity was largely stipulated. The following is a brief chronology of that publicity:

| Date | Event &/or Proceeding | Publicity |
|---|---|---|
| Jan. 7, 1967 | Crime committed | |
| Jan. 10–Feb. 26, 1967 | | Reports of the murder in local and Detroit newspapers; general factual accounts |
| Early Aug. 1967 | Petitioner arrested in Southfield robbery | |
| Aug. 15, 1967 | Petitioner identified as one of the killers | |
| Aug. 17–26, 1967 | | Reports of petitioner's arrest and identification, including mention of his participation in Southfield robbery and his brother's death in a gunfight with police |
| Sep. 26, 1967 | Co-defendant Coleman arrested | |
| Nov. 28, 1967 | Preliminary examination | |
| Mar. 19, 1968 | Trial set for April 8 | |
| Apr. 3, 1967 | | *Brighton Argus* article |
| Apr. (before the 10th), 1968 | Court grants two-month adjournment because of April 3 article and radio newscasts | |
| Apr. 10, 1968 | | Local newspapers report adjournment |
| May, 1968 | | *True Detective* article published |
| Jun. 3, 1968 | Trial begins; resumes June 6; continues through June 13 | |
| Jun. 5, 12, 1968 | | Local newspapers report on trial |

————◆————

In addition to objecting to the totality of the publicity petitioner charges that certain items were particularly prejudicial. These fall into three categories:

1. Reports of inadmissible or non-existent evidence:

a. Reports of petitioner's participation in a Southfield, Michigan armed

robbery and his brother's death in that incident;

These reports appeared in August 1967 (nine months before trial) at the time petitioner was identified by the murder victim's son. They also appeared in the May 1968 *True Detective* magazine article and the June 12, 1968 issues of local newspapers reporting on the progress of the trial;

b. *The Detroit News'* "Secret Witness" reported on August 26, 1967, such items as that petitioner was seen in Livingston County on the night of the murder and was heard discussing a getaway car. These items were also reprinted in the *True Detective* article. No evidence of any of these "facts" was presented at the trial;

c. Mention in *True Detective* magazine of a second eyewitness who could identify Mr. Hayton as one of the men who entered the drug store shortly before the murder;

2. Frequent accounts of the crime describing how the murder victim's son saw the crime;

Apparently, petitioner's argument is that these accounts strengthened this witness's credibility when he testified at trial as to what happened;

3. Information alleged to have generated localized prejudice toward the defendant;

Generally, this argument relates to such things as the crime having been attributed (at and shortly after the killing) to big-city criminals "invading" the rural community.

Petitioner refers to only four articles published within six months of the trial. Two of these are clearly innocuous. The third, the April 3, 1968 *Brighton Argus* article, is alleged to have been prejudicial because of the photograph of the prosecutor, State Police detective Vincent Demsky (the officer in charge of the case), and the district judge who had acted as magistrate at the preliminary examination—a hearing provided under Michigan law at which the State must establish probable cause to bind a defendant over for trial. This photograph and the article, it is argued, suggested that the Court was aligned with the prosecution and that the evidence has been "doubly scrutinized" (because two examinations—one for each defendant—were conducted). The testimony taken at the evidentiary hearing before this Court established that the trial judge adjourned the trial for two months at the request of counsel for petitioner's co-defendant, because of possible prejudice to defendants from this article and, particularly, the photograph. The fourth article, that published by *True Detective* magazine, does contain prejudicial statements. There were, however, only a very limited number of these magazines distributed in Livingston County. Sergeant Demsky testified that after hearing about the publication of the article from petitioner's attorney on May 8, 1968, he went to one of the stores in Howell where *True Detective* was sold; there he learned the name and address of the distributor, Southern Michigan News and Stouffler News, located in Ann Arbor, Michigan. From the distributor he learned that there were seven outlets in Livingston County to which the magazine was distributed and that 24 copies of the magazine had been thus distributed. Sergeant Demsky went to each of the outlets and was able to buy up five of the copies. The Prosecuting Attorney and the attorney for co-defendant Coleman each had one. He was also able to secure two others, accounting for nine of the 24. Although other copies of the magazine could, of course, be bought elsewhere than in Livingston County, the fact that there were still copies on the newsstands when Sergeant Demsky bought them, despite the fact that the distribution was so limited, indicates that there was no great interest in the community concerning the article in *True Detective*. There was no evidence that distribution of 24 copies was any greater than the usual distribution of that magazine in Livingston County. Further, although there is a suggestion in one of

petitioner's briefs that someone connected with the prosecution was responsible for this article, Sergeant Demsky testified that he was not the author and that he did not know who the author was. Since he was in charge of the case from the beginning, it is unlikely that the article could have been written by someone connected with the prosecution without Sergeant Demsky's becoming aware of that fact.

◼ Petitioner urges first that a new trial should be ordered without regard to whether the jury had in fact been affected by the pretrial publicity. Petitioner claims that the publicity was so inherently prejudicial that (1) the Court must presume that an impartial jury could not have been selected; and (2) even if an evidentiary hearing, or a *voir dire* transcript, showed that the jurors said they were unaffected by the publicity, that such statements would have to be rejected by the Court.

This position is untenable. The publicity, as revealed by the available newspaper and magazine reports, simply is not sufficiently prejudicial to bring this trial within the class of cases where new trials have been ordered regardless of the contents of the *voir dire* examination.

### A. Standard for Jury Impartiality

The basic standard for jury impartiality was set out by the Supreme Court in *Irvin v. Dowd,* 366 U.S. 717, 722–23, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961):

It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. *It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.*

(Emphasis added.)

◼ This standard, in the usual case, requires interrogation of potential jurors as a prerequisite to any finding that bias exists. *United States v. Abbott Laboratories,* 505 F.2d 565 (4th Cir. 1974) (reversing dismissal because of pretrial publicity before attempt to select a jury). Only in cases where the publicity is of a most extremely prejudicial nature and is sufficiently widespread that it can be presumed that many of the jurors had been exposed to it, do courts conclude that the jury was not impartial and overturn convictions either without examination of the *voir dire* (or in the case of publicity during the trial, questioning of the already-impaneled jury) or in spite of the assurances by the jurors that they have formed no opinions about the case or that they can set aside their opinions. See, e. g., *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); *Briggs v. United States,* 221 F.2d 636 (6th Cir. 1955).

◼ A number of factors should be considered to determine whether the publicity is so prejudicial that a defendant will be given (depending on the posture of the case) a continuance, a change of venue, a mistrial, or a new trial. Two of these factors—the timing of the publicity, and the degree of its prejudicial character—operate inversely, i. e., the more severe the publicity, the more time that must elapse before the jury can be found to have been unbiased. In addition, the Court must consider the probability that the jurors have seen the material. Finally, whether the trial was conducted in federal or in state court must be noted because a different standard is used when reviewing state court proceedings than when a federal trial is involved.

1. Severity of Prejudicial Character of Publicity—

The principal Supreme Court decision overturning a state conviction based on pretrial publicity without considering whether in fact the trial court was able to select an unbiased jury is *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). There, within approximately two months of the trial and a day after the murders involved, films of an interrogation session in which the defendant confessed to the slayings were broadcast over the television stations in the trial community. The Court decided that the defendant was entitled to a trial by a jury not drawn from the community which had seen the films. The Court's description of the effect of the broadcast was:

> For anyone who has ever watched television the conclusion cannot be avoided that this spectacle, to the tens of thousands of people who saw and heard it, in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder. Any subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality.

373 U.S. at 726, 83 S.Ct. at 1419.

*Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), was a case that had generated national interest (11 volumes of newspaper clippings were made part of the record). The principal aspect of the proceedings that the Court found unacceptable was the "circus atmosphere" which pervaded various hearings in the case. The hearing on the defense motion to exclude television cameras from the courtroom was televised live, as were portions of the trial. The jurors were constantly approached by the press. The Supreme Court did not require a specific showing of the manner in which the defendant was prejudiced by these events. Instead, it concluded "[E]xperience teaches that there are numerous situations in which it [television] might cause actual unfairness—some so subtle as to defy detection

by the accused or control by the judge." 381 U.S. at 544–45, 85 S.Ct. at 1634.

The Court's opinion in *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), shows that the Court examined the *voir dire* transcript with some care, although it did not rely heavily on a specific finding of prejudice. (It might well have, however, since eight of the jurors who tried the case thought the defendant was guilty, though they apparently said that they could put aside that opinion and try the case on the evidence). The prejudicial publicity was extreme. A series of six murders in the vicinity of Evansville, Indiana, were extensively covered by the news media in the locality and caused great excitement and indignation throughout the county (and the adjacent one where the case was finally tried). Among the material published regarding the defendant were inadmissible details of his background, reports of a lineup identification, and of defendant's taking a lie detector test, and, most damning, reports of confessions and of his offer to plead guilty in return for a 99-year sentence. 366 U.S. at 719–20, 81 S.Ct. 1639.

The other major Supreme Court decision that finds publicity too prejudicial for the Court to accept the jurors' assurances that they could try the case fairly is *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). That case had perhaps the worst publicity of all, with the news media essentially conducting a campaign to induce the government to charge, try and convict the defendant. Eleven of the jurors admitted having seen the pretrial publicity and the nature of the media coverage of the trial left little doubt that they were all exposed to prejudicial material during the trial. In addition, as in *Estes*, television and radio equipment intruded prominently into the courtroom during the trial.

In the instant case, the publicity in January and February 1967, following the murder, which is claimed to have created community outrage at the kill-

ing, occurred months before the defendant was identified (August 1967), and more than a year before the trial, limiting the extent to which the adverse publicity could be expected to attach to him. At the time of his arrest, certain other prejudicial material, such as the details of his participation in the Southfield robbery and his brother's death in the attempt to perpetrate that crime, became known, and there were several rumors reported in *The Detroit News* that apparently were false. These reports were approximately nine months before the trial. The *True Detective* article came somewhat closer to the impermissible standard in that it glorified police efforts to solve the crime and reported a number of items of evidence that were either non-existent or not introduced at trial or which were inadmissible. But still, for degree of prejudice, the instant case falls far short of *Rideau, Estes, Irvin* or *Sheppard.*

### 2. Timing of Pretrial Publicity—

Those cases that have overturned convictions on relatively mild publicity are distinguishable on a combination of two factors. First, they are primarily cases where federal courts of appeals were exercising supervisory power of federal trial courts. But perhaps more important, they are cases where the publicity was immediately before, during, the trial. In *Briggs v. United States,* 221 F.2d 636 (6th Cir. 1955), local newspapers reported the action of the district judge in issuing bench warrants against two of the government's witnesses charging them with perjury because they did not testify in accordance with their previous statements to the FBI. The Sixth Circuit made no attempt to determine if in fact any of the jurors saw the material, but instead concluded: "It is obvious that one or more of the jurors probably did." 221 F.2d at 639. The court's willingness to overturn the conviction without looking to actual exposure of the jurors to the material (the defendant's attorney chose not to have the court inquire of the jurors whether they had seen the

articles) appears to result from the emergence of the publicity during the trial. Before trial the *voir dire* should be able to produce a jury which has not seen prejudicial material. However, during trial questioning the jurors about the publicity may actually make matters worse, emphasizing it for those who have seen it, and informing those who have not of its existence. Further, jurors would be reluctant to admit that they have seen or heard the publicity, feeling perhaps that they have been at fault in doing so.

In *Coppedge v. United States,* 106 U.S. App.D.C. 275, 272 F.2d 504 (1959), during the trial local (Washington, D.C.) newspapers printed stories regarding the day's proceedings which included statements that a witness who had refused to testify had done so out of fear of the defendant, that the prosecutor thought the defendant was a vicious criminal, that the defendant had once attacked the witness's brother, and that the judge was of the opinion that the witness could not be protected from the defendant, either in or out of jail. The trial judge asked the jurors whether they had read the articles; four had but said they could still render an impartial verdict. The appellate court overturned the conviction.

*United States ex rel. Doggett v. Yeager,* 472 F.2d 229 (1st Cir. 1973), was a habeas case in which the local newspaper in the trial community reported an attempted escape, implying that the defendant had participated, and reported the fact that the defendant had originally pleaded guilty. The jury was questioned; two jurors had read the article, but said that they could still render a fair and impartial verdict. Thereafter, other articles appeared, which did not mention the guilty plea; the court did not interrogate the jury again. Again, the conviction was overturned.

In each of these cases, considerably less prejudicial material was involved than in the previously discussed Supreme Court decisions; however, it would appear that the appearance of the articles

during trial, when the jurors could hardly fail to be attracted to the material and when it was no longer possible to excuse the few jurors who had seen the material, was the controlling feature.

There are many cases, involving similarly prejudicial material, in which the courts have refused to find prejudice when the publicity was some time prior to trial. The Second Circuit explained this different treatment in *United States v. Bowe*, 360 F.2d 1, 12, cert. denied, 385 U.S. 961, 87 S.Ct. 401, 17 L.Ed.2d 306 (1966):

> [T]he fact that jurors exposed to publicity during a trial would probably be very reluctant to confess violating a trial court's admonition to refrain from consulting any materials dealing with the trial not introduced in evidence in front of their fellow jurors militates in favor of examining such jurors individually and out of the presence of other jurors. On the other hand, no such stigma is attached to an admission by a prospective juror that he has read or heard about a pending matter.

That case involved a charge of conspiracy to blow up the Statue of Liberty. The prejudicial material (mostly inadmissible material about the defendants' backgrounds) appeared three months before trial. See also *United States v. Corallo*, 284 F.Supp. 240 (S.D.N.Y.1968) (extensive local and national publicity of defendant's indictment on bribery conspiracy charges occurred five months before trial; material closer to trial was not so prejudicial; *United States v. Armone*, 363 F.2d 385, 393–96 (2d Cir.), cert. denied, 385 U.S. 957, 87 S.Ct. 391, 17 L.Ed.2d 303 (1966) (six weeks before trial newspapers implicated defendant in narcotics smuggling and implied that he had his girlfriend killed to keep her from talking).

The Supreme Court expressed the principle that staleness of the prejudicial publicity is a significant factor in *Beck v. Washington*, 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962). The case involved the prosecution of former Teamsters president, Dave Beck, Jr. Highly prejudicial publicity accompanied the investigation by the United States Senate Select Committee on Improper Activities in the Labor or Management Field that was followed by Beck's indictment for grand larceny relating to misuse of union funds. The Court concluded that the nine-month delay following the defendant's first appearance before the committee and the five-month delay in trial following the indictment was sufficient to diminish the prejudicial impact of the early reports. 369 U.S. at 556, 82 S.Ct. 955.

Although the cases involving passage of time from publicity to trial discussed to this point involved trials in large metropolitan areas (three in New York City, and one in Spokane), courts have found time lags between publicity and trial a critical factor in upholding convictions in smaller communities, as well. See, e. g., *United States ex rel. Brown v. Smith*, 306 F.2d 596, 601–04 (2d Cir. 1962) (trial in small Vermont town; reporting of defendant's criminal record three months before his trial did not require overturning conviction); *Walker v. Bishop*, 408 F.2d 1378 (8th Cir. 1969) (trial for murder in Arkansas; most of publicity was fourteen months before trial; one article appeared several months before trial discussing this and another case and suggesting that death was the only suitable penalty for offenders like defendant).

Excluding for the moment the *True Detective* article in May 1968, there seems to have been sufficient time between the arguably prejudicial stories and trial for this Court to reject the conclusion that an impartial jury could not be obtained in Livingston County without regard to what occurred in the *voir dire*. The articles appearing at about the time of trial are not sufficiently prejudicial to permit the inference the jury was biased. Petitioner argues that the April 3, 1968 *Brighton Argus* article [Exhibit 3 to the State's Motion to Dismiss] is extremely prejudicial, largely on the ground that the trial judge based his decision to grant a two-month continu-

ance in part on "newspaper publicity". Examination of the article really does not support that contention. The two-month delay would appear to be sufficient to dissipate any possible *per se* result from this article.

3. Probability that Jurors have seen Prejudicial Material—

There would appear to be no doubt that most, if not all, of the jurors had some acquaintance with this case from newspapers reports.[3] However, as indicated above, the nature and timing of these reports was not such as to require a conclusion that an unbiased jury could not be selected.

The *True Detective* article poses somewhat more serious problems both as to the time factor and the degree of prejudice. However, in view of the *voir dire* that was conducted it appears that none of the jurors saw the article. In view of its very limited distribution, their statements that they had not are not suspect.

A case very similar to the instant one is *Anderson v. Gladden*, 303 F.Supp. 1134 (D.Or.1967), aff'd, 416 F.2d 447 (9th Cir. 1969). There were two types of publicity involved—newspaper reports and an article in *Headquarters Detective* magazine entitled "Kid Tomahawk," which appeared during the trial. The court concluded:

> The newspaper stories were factual reports of the trial, but the "Kid Tomahawk" article is full of falsehoods and half-truths. If the jurors had seen it, this article alone might be sufficient to require a new trial.

> The mere publication of the "Kid Tomahawk" article during the trial, without a showing that at least one juror read the article, is insufficient to require the setting aside of the jury's verdict.

303 F.Supp. at 1137.

There is nothing in the present record to indicate that any of the jurors in fact saw the *True Detective* article.

Because the factors which permit an inference that the jurors could not have been unbiased are not present in this case, the Court could not grant a writ of habeas corpus without attempting to ascertain whether the particular jury selected was in fact unbiased.

Ordinarily, whether it was possible to select an impartial jury could be ascertained from the *voir dire*. But in the instant case no transcript exists and one cannot be secured. Its unavailability arose out of the following circumstances. The official reporter was ill and absent the first day of the trial when the jury was selected. The attorney who represented petitioner at trial and also in his direct appeal to the Michigan Court of Appeals chose not to raise the pretrial publicity issue on appeal. As a result, no *voir dire* transcript was ordered at that time. The attorney was apparently aware of the availability of such a ground since he had made pretrial motions for continuances and a change of venue raising that issue. There is nothing to indicate that a free transcript of the *voir dire* would not have been furnished if it had been requested at that time. The substitute court reporter's notes were available for a period of time, but when the reporter moved her residence they were lost, thrown away, or misplaced so that they cannot be found. Petitioner did not ask for a transcript of the *voir dire* until three years after the trial.

██ Under these circumstances, the inability of the state court to provide a transcript of the *voir dire* does not deny petitioner due process of law. The basis of the due process claim based on transcript unavailability is that the lack of a transcript deprives the petitioner of effective appellate review of his conviction. See *Pate v. Holman*, 341 F.2d 764 (5th Cir. 1965). However, given the

---

**3.** An evidentiary hearing was held to determine what was said at the *voir dire*. This hearing is discussed later in this opinion.

cases rejecting such a claim where no appeal was taken on the ground that the defendant had an attorney who was capable of pursuing the appeal—e. g., *Norvell v. Illinois*, 373 U.S. 420, 83 S.Ct. 1366, 10 L.Ed.2d 456 (1963); *Pisani v. Warden*, 289 F.Supp. 232 (D.Md.1968); *Carden v. Henderson*, 284 F.Supp. 1009 (E.D.Tenn.1967)—a fortiori, where trial counsel did pursue an appeal, petitioner's constitutional rights have not been denied.

In addition, petitioner's delay in requesting a *voir dire* transcript makes it inappropriate to conclude that the state is at fault in the loss of the reporter's notes. Cf. *United States ex rel. Hunter v. Follette*, 307 F.Supp. 1023, 1025 (S.D.N.Y.), *aff'd* 420 F.2d 779 (2d Cir. 1969).

Finally, as indicated below, the evidentiary hearing conducted in this Court revealed that the jury selected was not biased due to pretrial publicity.

B. *Evidentiary Hearing Regarding Conduct of Voir Dire*

In view of the absence of a transcript this Court held an evidentiary hearing to determine whether the jury selected was affected by the publicity.

The normal test for holding an evidentiary hearing appears to be met in view of the circumstances existing here. The standard is set out in *Townsend v. Sain*, 372 U.S. 293, 312–13, 83 S.Ct. 745, 757, 9 L.Ed.2d 770 (1963):

> Where the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding. In other words a federal evidentiary hearing is required unless the state court trier of fact has after a full hearing reliably found the relevant facts.

> .    .    .    .    .

We hold that a federal court must grant an evidentiary hearing to a habeas applicant under the following circumstances: If (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

The record from the state courts does not show whether petitioner received a fair hearing on the question of jury partiality when the motion for a continuance and a change of venue were denied after the jury was impaneled. Further, when petitioner raised publicity-related issues on his delayed motion for a new trial, the record does not contain the factual basis for the denial of the motion by the Circuit Court or for the denial of leave to appeal by the Michigan Court of Appeals and Supreme Court.

Although the Court has been unable to find any habeas case in which a hearing has been held to reconstruct what happened at *voir dire*, this is probably because a transcript is usually available. Under analogous circumstances in *Anderson v. Gladden*, 303 F.Supp. 1134 (D.Or.1967) *aff'd* 416 F.2d 447 (9th Cir. 1969), however, the federal district court did hold a hearing to investigate jury bias. The question there was whether the jurors had seen copies of a magazine published during the trial. State court post-conviction review proceedings have sometimes involved attempts to reconstruct events at trial. See, e. g., *Norvell v. Illinois*, 373 U.S. 420, 83 S.Ct. 1366, 10 L.Ed.2d 456 (1963); *Pate v. Holman*, 341 F.2d 764 (5th Cir. 1965).

Further, a verbatim transcript is not needed in the instant case, nor is it necessary to precisely duplicate the questions and answers of the jury in order to determine if the jurors were impartial. Any information regarding the conduct of the *voir dire* would be helpful in de-

termining the issues presented by this petition.

At the evidentiary hearing held February 10, 1975, testimony was received from the following persons: Petitioner's trial counsel; Counsel for petitioner's co-defendant, Paul Coleman; An assistant prosecutor present during the trial who assisted the now deceased prosecuting attorney; State Police Detective Vincent Demsky who was present during the entire trial; and the editor of the Brighton-Argus, a newspaper published in Livingston County, who also attended the trial.

■ From their testimony, it seems clear that the state trial judge thoroughly *voir dired* the jury panel regarding their knowledge of the case and pretrial publicity, and that no need for a change of venue was demonstrated.

Petitioner's attorney testified that he was admitted to practice in 1956, and had extensive experience in criminal cases prior to 1968; that he had followed the newspaper publicity regarding the instant case, particularly in *The Detroit News*, where it received mention because it was one of the earliest cases in that newspaper's "Secret Witness" promotion. He also had been told of the radio publicity in Livingston County. Although it was the codefendant's attorney who filed the motion for a change of venue, petitioner's counsel recalled that he had made a similar motion on the day of trial.

As previously noted, the state court judge had granted an adjournment of two months because of publicity and reserved his ruling on the motion for change of venue to see if a jury could be drawn.

Petitioner's attorney recalled that a jury panel of 95 jurors (about double the usual number) were summoned for this case. He testified that the judge conducted the *voir dire* and that counsel were required to present their questions to the jurors through the Court. He did not recall very many of the questions asked the jurors but did recall they were questioned about possible prejudice and that at least some jurors who said they had read newspaper articles and wanted to be excused for that reason were excused. He testified that he did not exercise all his client's peremptory challenges and that he expressed satisfaction with the jury. He further testified that he knew that a jury could be selected from the panel and preferred the jurors seated to those he might get if those seated were challenged. He recalled that on the day of the jury selection the judge stated, "Let's see if we can pick a jury from this panel," or words to that effect. He did not recall whether the judge expressly denied the motion for change of venue but it was at least implicitly denied when the jury was selected. It was the attorney's recollection that it took an entire morning to select the jury.

The reporter and editor for the *Brighton Argus* who had attended the trial testified that he recalled having been present in April 1968, when the judge postponed the trial for two months because of newspaper and radio publicity.

He testified that Livingston County had a population of approximately 60,-000; that the Reck family, of which the victim was a member, was a large family and well-liked in the county; that the *Brighton Argus, The Livingston County Press, Fowlerville Review, The Detroit News*, the *Detroit Free Press*, and the *Lansing State Journal* were the newspapers circulated in the county.

The attorney who represented codefendant Coleman had his office in Brighton, Livingston County. He testified that his motion in April, 1968 for postponement of the trial because of pretrial publicity was granted by the trial judge with very little argument. Counsel particularly objected to a photograph of Sergeant Demsky, the prosecuting attorney, and the municipal judge, who had bound defendant over for trial, smiling together. He felt the picture showed that the municipal judge (who was not the trial judge) was going along with the prosecution.

Mr. Coleman's attorney testified that during selection of the jury the trial judge inquired specifically regarding the jurors familiarity with publicity about the case; that he asked whether any juror had read anything which caused the juror to form an opinion that would require evidence to remove. Although he did not read the questions that Mr. Coleman's attorney had submitted, the judge had asked as requested whether the jurors could be prejudiced against the defendant Coleman because of his unstable married life. It was the attorney's recollection that almost all of the jurors had been exposed to some newspaper or other publicity about the case at some earlier time. All potential jurors were questioned about what they had read. He characterized the judge's *voir dire* as "searching."

His trial notes showed that 126 jurors were summoned so that there would be an adequate number from which to select an unbiased jury. He further recalled that the judge ruled after the jury was sworn that since a jury had been selected, the motion for a change of venue was denied. He recalled Mr. Hayton's attorney making an oral motion for a change of venue on the first morning of the trial before the jury selection began.

Mr. Coleman's attorney recalled that the jurors were asked about popular or "pulp" magazines and that all denied having read anything about the case in any magazine. It was his recollection that the judge did not refer to *True Detective* magazine by name.

The former assistant prosecuting attorney testified that he, too, was present at *voir dire*. In addition to the usual questions asked in every case, he recalled that the jurors were asked about magazine articles. He did not remember any juror saying he or she had seen or read any such articles. He further testified that the *voir dire* took only one-half day; whereas, it had been anticipated by the prosecutor that it might last two days.

He testified that the Court Reporter's notes of the *voir dire* were around for a period of time and that the prosecutor was asked if he wanted that portion of the record transcribed. There was no request for it during the state appeals. He further testified that he had tried a number of cases before the trial judge, and that the judge never permitted attorneys to question jurors directly but that the judge asked numerous questions. He testified that the prosecutor did not oppose the motion for adjournment or for change of venue but did oppose a motion for separate trials.

Detective Sergeant Demsky of the Michigan State Police testified he had been with that department 28 years. He was in charge of this case and was present at the *voir dire*. He recalled that the judge did inquire about pretrial publicity.

With respect to the article in *True Detective*, he testified he learned of it on May 8, 1968, when Mr. HAYTON's attorney brought it up. As noted above, pages 4 and 5, he went to one of the stores in Howell, learned the name of the distributor, an Ann Arbor concern; from it he learned of its outlets in Livingston County and purchased the copies he could. He was unable to trace the other copies. He was aware of an article in the *Lansing State Journal* of May 16, 1968, about his efforts to purchase copies of the magazine. He denied that he was the author of the magazine article in *True Detective* and testified that he did not know who wrote it. He kept copies of all newspaper articles he could find regarding the case. He could recall none that are not included in the exhibits in this case.

The testimony of the various witnesses present at the *voir dire* is essentially the same. They do not contradict one another. Each witness's testimony supplements and corroborates that of the others. From the testimony, the Court finds that the trial judge fairly *voir dired* the jury as to pretrial publicity and possible prejudice against the defendants. There was no evidence that he refused to cover any questions that counsel requested. Mr. Coleman's attorney

testified that it was the judge's practice to permit counsel to request, at side-bar conferences out of the hearing of the jury, any additional questions they wished the jury asked. Had he refused to ask any questions so requested it seems likely that some one of the three attorneys who testified would have remembered this incident. Mr. Coleman's attorney still had his trial notes. No request for a transcript of the *voir dire* was made at the time of the initial appeal. Had the voir dire been unusual in any respect it seems likely that counsel, when his memory was fresher, would have requested it for the appeal. Most significantly, each defendant stated he was satisfied with the jury.

In addition, the failure of the defense to exhaust its peremptory challenges (see Exhibits to the State's Motion to Dismiss, 8–10) suggests that petitioner's rights were protected. This factor alone would not be dispositive, *Delaney v. United States*, 199 F.2d 107 (1st Cir. 1952), but in many cases, as here, it is reinforcement for the conclusion that an impartial jury was selected. *Meador v. United States*, 341 F.2d 381, 383 (9th Cir. 1965); *Shushan v. United States*, 117 F.2d 110, 116 (5th Cir.), *cert. denied*, 313 U.S. 574, 61 S.Ct. 1085, 85 L.Ed.2d 1531 (1941).

Therefore, the Court concludes that there is nothing to suggest that the jury which convicted petitioner was not impartial. The pretrial publicity in this case was not such as would require a new trial in the absence of a showing that there is reason to believe that the jury impaneled was not impartial.

## II. CROSS–EXAMINATION OF DEFENDANT REGARDING HIS FAILURE TO ASSERT ALIBI DEFENSE WHILE IN CUSTODY

■ Petitioner claims that he was subjected to improper cross-examination and comment on his post-arrest failure to

mention the alibi defense which he later asserted at trial. The relevant series of questions and answers are as follows:

Q: When did you first discover that you, after this thing, when did you first discover that you were, you think you were at your sister's on the night of January 7, 1967?

A: It was while I was in the Oakland County Jail. I had been there about a little over six months, and I figured out that was where I was at.

Q: O. K. About what date would you think you first came to that you were, that you had been at your sister's house?

A: What now?

Q: When do you say, around what date or what month, you first discovered and come to that you might have been at your sister's house on the night of January the 7th, 1967?

A: I really don't know.

Q: You were still in the Oakland County Jail?

A: Yes, I was still there.

Q: On several occasions you had a chance to at least ride in a car with Mr. Demsky [Michigan State Police detective], didn't you?

A: Yes, sir, I did.

Q: He transported you to court and things like that?

A: Yes.

Q: You ever tell him that you had been with your sister on January 7th, 1967, at the time this alleged offense happened?

A: I don't think so, no.

(Transcript, at pp. 621–22). A number of other passages are cited by petitioner on this point, including parts of the final arguments;[4] however, these do not go to the question of whether there was improper cross-examination or comment

4. The prosecutor did not comment in argument on the defendant's failure to mention the alibi defense earlier. Petitioner's trial counsel did attempt to explain Mr. HAYTON's failure to mention the alibi until long after his arrest (Transcript at 773–74).

by the prosecutor, but rather to whether the error, if any, was harmless. Essentially, the only potentially improper portion is the last three questions and answers of the above-quoted series. At no time during the trial did defense counsel object to this line of questioning. The trial judge did not instruct the jury in any way regarding that particular line of questioning. In his charge to the jury, the trial judge instructed them that the credibility of the defendants as witnesses should be evaluated in the same manner as other witnesses. (Transcript at 813–15). The Judges' instructions on credibility of witnesses did not mention the use of prior inconsistent statements for impeachment. (Transcript at 812–13). The transcript indicates that defense counsel had no objections to the charges given and requested no additional charges. (Transcript at 829).

The law in the area of cross-examination on post-arrest silence has undergone significant development in the last few years. The initial case was *Raffel v. United States*, 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed. 1054 (1926). There, the defendant made an incriminating statement when arrested. At the first trial he did not testify, but the statement was introduced through the testimony of the officer who interrogated him. Following a hung jury, the defendant was retried. Again, the statement was introduced. This time defendant took the stand and denied having made the statement. The court permitted cross-examination regarding the failure to testify at the first trial. In affirming the conviction, the Supreme Court essentially held:

> The immunity from giving testimony is one which the defendant may waive by offering himself as a witness. . . . When he takes the stand in his own behalf, he does so as any other witness, and within the limits of the appropriate rules he may be cross-examined as to the facts in issue. . . . He may be examined for the purpose of impeaching his credibility. . . . His failure to deny or explain evidence of incriminating circumstances of·

which he may have knowledge may be the basis of adverse inference, and the jury may be so instructed. . . .

> His waiver is not partial; having once cast aside the cloak immunity, he may not resume it at will, whenever cross-examination may be inconvenient or embarrassing.

271 U.S. at 496–97, 46 S.Ct. at 567.

Then, in 1957, the Supreme Court decided *Grunewald v. United States*, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957). The defendant had generally maintained his innocence when called to testify before a grand jury, but had answered some questions by asserting his 5th amendment right to be free from forced self-incrimination. At his trial he testified and answered those same questions (as to which he had taken the 5th amendment) in a manner "consistent with innocence." The government was permitted to cross-examine him about his failure to answer those questions before the grand jury. The trial court instructed the jury that his prior failure to answer could be used for impeachment only and not as evidence of guilt. The Supreme Court expressed the new test as follows:

> [W]hether in the particular circumstances of this case the cross-examination should have been excluded because its probative value on the issue of Halperin's credibility was so negligible as to be far outweighted by its possible impermissible impact on the jury.

353 U.S. at 420, 77 S.Ct. at 982. In reversing the conviction, the Court noted that it was exercising its supervisory power over federal courts.

A related development was the Court's decision in *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), holding that comment by a state prosecutor or court on the failure of the defendant to testify constituted a constitutional violation.

Thereafter, a number of circuits considered cases similar to the instant one. Some of these stress that allowing such cross-examination and/or comment un-

dermines a defendant's constitutional right to remain silent. See, e. g., *United States v. Brinson*, 411 F.2d 1057 (6th Cir. 1969).

In a number of cases the silence at arrest is not really inconsistent with trial testimony and therefore has no probative value for impeachment purposes. E. g., *Fagundes v. United States*, 340 F.2d 673 (1st Cir. 1965):

> When one takes the stand in his own defense he of course puts his credibility as a witness in issue. Nevertheless we think it reversible error to permit evidence of refusal to talk and of request for counsel on arrest to be used for the purpose of impeachment. In the first place such evidence is ambiguous. Fagundes' words when arrested can as well be taken as indicating reliance upon constitutional rights as supporting an inference that his alibi was an afterthought. There is nothing to indicate which interpretation is more probable.

340 F.2d at 677. See also, *United States v. Semensohn*, 421 F.2d 1206 (2d Cir. 1970); *Fowle v. United States*, 410 F.2d 48 (9th Cir. 1969).

The only court of appeals to take the opposite position before 1971 was the Fifth Circuit in *Sharp v. United States*, 410 F.2d 969 (1969). *Sharp* essentially said that *Raffel* compels permitting such cross-examination.

Following the Supreme Court's decision in *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), which permitted the prosecution to question a defendant about the inconsistency of his trial testimony with statements made earlier, even though the prior statements were taken without the giving of *Miranda* warnings, several courts took a different approach in cases where a defendant was cross-examined regarding post-arrest silence. *United States v. Ramirez*, 441 F.2d 950 (5th Cir. 1971) presented facts typical of post-arrest silence cases. The Fifth Circuit concluded:

> The analogy of *Harris* to the case at hand is inescapable. Once Ramirez

elected to testify and assert the defense of coercion he became subject to the "traditional truth-testing devices of the adversary process", including the right of the prosecution to show his prior inconsistent act of remaining silent at the time of his arrest.

441 F.2d at 954. As indicated by the *Sharp* decision, discussed above, the Fifth Circuit had never thought *Grunewald* required investigation of whether silence was inconsistent with later testimony. See also *United States ex rel. Burt v. New Jersey*, 475 F.2d 234 (3d Cir. 1973).

Not all courts after *Harris* have concluded that silence can be used to impeach. In *Johnson v. Patterson*, 475 F.2d 1066 (10th Cir. 1973), the Tenth Circuit concluded:

> When a defendant makes a statement at trial which is inconsistent with an earlier statement his credibility is clearly in question. This rationale does not follow with silence at the time of arrest. As the trial court properly found in the instant case, silence at the time of arrest is not an inconsistent or contradictory statement. Silence at the time of arrest is simply the exercise of a constitutional right that all persons must enjoy without qualification.

475 F.2d at 1068.

The Michigan Supreme Court appears to have adopted a rule that it is prejudicial error to cross-examine a defendant regarding his silence following arrest. See *People v. Bobo*, 390 Mich. 355, 212 N.W.2d 190 (1973).

■ Then on June 24, 1975, the United States Supreme Court decided *United States v. Hale*, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99. Presented with a case involving fairly limited cross-examination of a defendant regarding post-arrest silence, the Court held that the probative value of a defendant's silence following arrest was outweighed by the prejudicial impact of admitting it into evidence. The Court expressly declined, however, "to reach the broader constitu-

tional question that supplied an alternative basis for the decision below".[5] 422 U.S. at 173, 95 S.Ct. at 2135. This petition raises that constitutional issue in a posture in which the supervisory power relied upon in *Hale* is not available. The constitutional issue will apparently be decided by the Supreme Court this term since it has granted review in *Doyle v. Ohio*, 423 U.S. 823, 96 S.Ct. 36, 46 L.Ed.2d 39, and *Wood v. Ohio, cert. granted*, 423 U.S. 36, 96 S.Ct. 36, 46 L.Ed.2d 39 (1975). However, since this court already delayed its decision in this case awaiting the opinion in *Hale*, it seems unfair to petitioner to delay it further.[6]

Certain of the Court of Appeals' decisions discussed above seem to suggest a *per se* rule—either that silence can never be used for impeachment, e. g., *Johnson v. Patterson*, 475 F.2d 1066 (10th Cir. 1973), or that it can always be used, e. g., *United States v. Ramirez*, 441 F.2d 950 (5th Cir. 1971). However, the better approach would seem to be that the Court should make an inquiry in each case whether the silence is in fact inconsistent with the trial testimony and then balance the probative value of the evidence on the issue of credibility against it's potential prejudicial effect. In *Hale* the Supreme Court apparently adopted this approach, at least in federal trials:

> We now conclude that the respondent's silence during police interrogation lacked significant probative value and that any reference to his silence under such circumstances carried with it an intolerably prejudicial impact.
>
> Accordingly, we hold that under the circumstances of this case it was prejudicial error for the trial [judge] to

permit cross-examination of respondent concerning his silence during police interrogation, and we conclude, in the exercise of our supervisory authority over the lower federal courts, that Hale is entitled to a new trial.

422 U.S. at 181, 95 S.Ct. at 2138.

In the instant case, post-arrest silence would not be clearly impeaching. Petitioner was arrested more than seven months after the murder, and it would be expected that he would need some time to establish his whereabouts on the night in question. As for a failure to tell the police of the alibi as soon as he recalled where he was, it would be just as probable that he and his attorney concluded that compliance with Michigan's notice-of-alibi-defense statute, M.S.A. § 28.1043, was all that was required.

However, the record in the instant case does not support petitioner's assertion that there was post-arrest silence. Since no objection was made to these questions, all of the circumstances of the conversations between the State Police detective and petitioner are not in the record. But the following does appear. In final argument counsel for petitioner states: "He [the detective] had no trouble on one occasion in taking him [petitioner] to the State Police Post on Grand River at Seven Mile Road for interrogation, which was conducted in my absence. I agreed to it, but he had his hands on him that day." (Transcript at 766). Elsewhere in the record it appears that petitioner went to a lie detector test at a State Police post. (Transcript at 319) (statement by petitioner's trial counsel in absence of jury; apparently referring to the same incident that he mentioned in closing argument).

---

5. The grounding of the Supreme Court's decision on its supervisory power is reiterated at several points in the opinion. For example, in footnote 7 of the opinion, 422 U.S. at 180, 95 S.Ct. at 2138, the Court states:

> We recognize that the question of whether evidence is sufficiently inconsistent to be sent to the jury on the issue of credibility is ordinarily in the discretion of the trial court. "But, where such evidentiary matters have

grave constitutional overtones . . . we feel justified in exercising this Court's supervisory control." *Grunewald v. United States*, 353 U.S., at 423–24, 77 S.Ct. [963] at 983.

6. However, as noted above, footnote 1, *supra*, petitioner is serving another, unchallenged sentence so that the decision in this matter will not have an immediate impact on the status of his incarceration.

■ There is a considerable difference between remaining silent on the one hand, and talking freely but failing to mention an alibi on the other. *Cf. Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). None of the factors mentioned in *Hale* apply to the latter situation.[7] Had petitioner's counsel objected to the nature of the cross-examination, the full circumstances of the conversations that petitioner apparently had with the police would have become part of the record.[8] However, there is sufficient information in the record to conclude that petitioner did not remain silent.

### III. ABSENCE OF PETITIONER DURING TRIAL

Petitioner argues that he was denied due process of law when testimony was taken while he was out of the courtroom.

Although it is clear that a health problem of some nature caused petitioner to leave the courtroom several times, there is only one point where the transcript shows that any proceedings occurred in his absence. That was the occasion when the detective in charge of the case was recalled by counsel for the codefendant. The detective testified about his investigation of the codefendant's alibi defense. (Transcript at 681–84). There is another point in the trial where the transcript shows that the petitioner was excused by the court, but the record does not indicate when he returned or if any of the proceedings were conducted in his absence. (Transcript at 568–69). The brief that petitioner filed in the trial court seeking a new trial asserts that on

that occasion, and several others, testimony was taken before he returned.

■ The defendant clearly has the right to be present during such proceedings; however, two grounds exist for concluding that his absence would not affect his conviction. The right to be present can be waived, *Cf.* Fed.R.Crim. Pro. 43, and, even if no effective waiver is found, the absence of a defendant is subject to the harmless error rule. *United States v. Reynolds*, 489 F.2d 4 (6th Cir. 1973).

At least under some circumstances, the right to be present can be waived. *Snyder v. Massachusetts*, 291 U.S. 97, 106, 54 S.Ct. 330, 78 L.Ed. 674 (1934). Defense counsel requested that the defendant be permitted to leave the courtroom and made no objection when the witness was called and questioned. However, there is some indication in recent cases that in order to find a voluntary waiver, the defendant must have been warned that the trial could continue in his absence. *United States v. McPherson*, 137 U.S. App.D.C. 192, 421 F.2d 1127 (1969). It would appear clear from the record here that defendant knew the trial was continuing in his absence. There is no indication or claim that the trial judge was unwilling to await his return, or impatient with him or his counsel because he needed to be excused.

■ Further, the absence of the defendant at the time indicated was harmless beyond a reasonable doubt. It is difficult to imagine how defendant could have been harmed by this questioning of the detective. Petitioner's brief con-

---

**7.** The Court explained:

> At the time of arrest and during custodial interrogation, innocent and guilty alike—perhaps particularly the innocent—may choose to stand mute. A variety of reasons may influence that decision. In these often emotional and confusing circumstances, a suspect may not have heard or fully understood the question, or may have felt there was no need to reply. [citation omitted] He may have maintained silence out of fear or unwillingness to incriminate another. Or the arrestee may simply react with silence in

response to the hostile and perhaps unfamiliar atmosphere surrounding his detention.

422 U.S. at 177, 95 S.Ct. at 2137.

**8.** This case provides an illustration of the importance of the general principle that trial counsel must object to prosecution questions or comments before a federal habeas court may grant relief on the basis of improper trial conduct by the prosecutor. *Cf. United States ex rel. Satz v. Mancusi*, 414 F.2d 90 (2d Cir. 1969); *United States ex rel. Kirk v. Petrelli*, 331 F.Supp. 792 (N.D.Ill.1971).

structs the following explanation of how he might have been prejudiced:

> Because James Hayton had a kidney ailment which necessitated his absence from the courtroom he was not present for the courtroom drama in which the detective in charge of the investigation conceded that payroll checks in police possession supported codefendant Coleman's alibi defense that he was at work as a security guard on the night of the crime. The significance of such a concession by a hostile prosecution witness might well be apparent to a layman. In a tense joint trial situation, the detective in charge of the case conceded he had been negligent in investigating the proffered alibi of *one* of the defendants. Petitioner's motion for a separate trial having been denied, and the judge having declared in denying petitioner's mistrial motion that the "joint trial issue" would not be re-opened, the case went to the jury with an admission that the police had been negligent as to Coleman's alibi, and by inference "non-negligent" as to Hayton. If petitioner had been present in the courtroom and aware that, in effect, his codefendant's difficulty in reconstructing past events could be attributed to the errors of the police investigators, that might well have triggered just the sort of meaningful consultation between attorney and client about potential trial strategy which underlies an accused's right to be present at all stages of the adjudicatory process. In addition, had petitioner been present, he would have been aware of an additional reason supporting his claim that the joint trial was to his prejudice.

Brief at 64.

The Court is unable to accept the above suggestion. There was nothing in Mr. Hayton's alibi that was subject to

being checked by the police in the way that there was as to defendant Coleman's alibi.[9] Petitioner's alibi witnesses were his sisters. The cross-examination of one of the sisters indicated that the prosecutor had gone to Ohio to interview her before trial. (Transcript at 576-77). The cross-examination of the other indicated that that witness had talked to the officer in charge of the case at some time prior to trial without mentioning the situation to which she testified at trial. (Transcript at 585). Thus, there was very little left to be inferred about whether the police were "non-negligent" in checking petitioner's alibi.

Although Michigan has a very inflexible rule (created by statute) requiring the presence of the defendant whenever testimony is taken, see *People v. Medcoff*, 344 Mich. 108, 73 N.W.2d 537 (1955), petitioner does not claim that violation of this state rule has federal constitutional consequences. Clearly the federal rule is not so rigid and would apply the harmless error rule even when it is the taking of testimony with the defendant not present. See *United States v. Baltierra-Frausto*, 472 F.2d 597 (9th Cir. 1973).

## IV. PROSECUTORIAL MISCONDUCT

■ Finally, petitioner complains of many instances of allegedly improper conduct by the prosecution. As petitioner recognizes in the denomination of his argument ("the totality of misconduct . . . deprived petitioner of his right to a fair trial") most of the individual incidents are not sufficiently serious to warrant overturning the conviction. Whether they do so when taken together must in turn depend upon their significance in the totality of the trial. Two recent decisions by the United States Supreme Court guide the approach this Court should take in considering errors

9. Petitioner's alibi was that he was at his sister's house on the evening the crime was committed. He called the sister who he said he was visiting and another sister who testified that she was there that evening. The code-fendant's alibi was that he was at work that night. The questioning of the officer was in regard to whether he had interviewed the employer about payroll records, which apparently supported the alibi. (Transcript at 682-684).

by prosecutor, trial counsel or trial judge.

In *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974), the state defendant complained of the final argument by the prosecutor which could be construed to imply that the defendant offered to plead guilty to a lesser charge. The Supreme Court reversed a finding by the First Circuit that the remark had that effect and explained:

> The Court of Appeals in this case noted . . . that its review was "the narrow one of due process, and not the broad exercise of supervisory power that [it] would possess in regard to [its] own trial court." We regard this observation as important for not every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a "failure to observe that fundamental fairness essential to the very concept of justice."

416 U.S. at 642, 94 S.Ct. at 1871.

The Court's opinion in *Donnelly* refers to its earlier decision that year in *Cupp v. Naughten*, 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1974), which involved a challenge to a "presumption of truth" instruction in a state trial. There, the Supreme Court said:

> A single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge. . . . While this does not mean that an instruction by itself may never rise to the level of constitutional error, . . . it does recognize that a judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of exhibits in evidence, and instruction of the jury by the judge. Thus not only is the challenged instruction but one of many such instructions, but the process of instruction itself is but one of several components of the trial which may result in the judgment of conviction.

414 U.S. at 146–47, 94 S.Ct. at 400.

Although matters involving the conduct of the trial can rise to the level of constitutional error, it is not often that they do so. A careful reading of the entire trial transcript[10] in this case persuades the Court that the trial was fairly conducted and petitioner was competently represented. Further, the prosecution's conduct, although vigorous, was not unfair. This case is therefore clearly distinguishable from *Manning v. Jarnigan*, 501 F.2d 408 (6th Cir. 1974), in which the Court of Appeals remanded for an evidentiary hearing as to whether prosecutorial misconduct violated defendant's right to a fair trial. The misconduct there involved included references to defendant's prior criminal acts, and the possibility that the prosecutor "boasted . . . that he knew that his questions were objectionable, but that, even if they were stricken, the jury would not forget." 501 F.2d at 412.

In the instant case, the petitioner objects to the State Police detective's hearsay testimony about the victim's son's identification of petitioner's photograph. The trial judge had sustained defense objections to the prosecutor's direct examination questions which would have permitted the detective to relate what the witness said upon viewing the photos. Then on cross-examination in response to a question which essentially asked whether the showup was held on the same day that the witness viewed the photograph the detective said " . . . I can tell you the time I showed him the picture too, if you like—2:45 P.M. I was told 'That's the guy; that's him.'" (Transcript at 288). Upon defense counsel's request the judge ordered the jury to disregard the remark. This incident was thoroughly considered by the Michigan Court of Appeals on petitioner's direct appeal. *People v. Hayton*, 28 Mich. App. 673, 675, 184 N.W.2d 755 (1970). In view of the fact that the witness referred to testified to the same effect about this photo spread later in the trial,

---

**10.** The trial transcript consists of 830 pages.

(Transcript at 490), petitioner was in no way harmed thereby.

Second, the officer in charge of the case testified as to defendant's participation in the Southfield armed robbery before defendant's credibility was put in question. If this had been part of the prosecution's case, and had the defense attorney objected, the error would have been serious. However, the answer came in response to a question by petitioner's attorney which asked, "and why did you request that photograph?" [The photograph of petitioner that the victim's son identified] (Transcript at 281). The detective's answer—essentially that he heard there had been a robbery in Southfield and had requested photos of the perpetrators—was perfectly responsive, despite the assertion to the contrary in petitioner's brief.

Further, defendant's opening statement, made at the beginning of the case, brought to the attention of the jury that petitioner was in jail on another charge when identified as the perpetrator of the crime here and that it was because of petitioner's involvement in this other crime that the eyewitness picked out petitioner as the murderer. The detective had been present during this opening statement. His answer, in this context, is not egregious.

In addition defense counsel sought no measures to mitigate any possible harm of this statement, and the judge's jury charge said that prior convictions could only be used for credibility purposes. (Transcript at 813–14). And, of course, defendant's credibility was later put into question by his decision to take the stand.

Petitioner objects to the introduction of a number of allegedly prejudicial side issues. In one case a witness testified that petitioner had stuck his finger in the witness's back and said "stick them up." (Transcript at 215). The trial judge ordered this testimony stricken on motion of defense counsel. (Transcript at 221). Petitioner complains of the prosecutor's cross-examination of him regarding an incident where he hit his wife with a beer bottle. (Transcript at 620). There was no objection, and apparently the defendant pleaded guilty to some offense as a result of this incident. The defendant was asked about his brother's death in the Southfield armed robbery and the brother's shooting at police. (Transcript at 637–38). This, too, was irrelevant, but again there was no objection by defense counsel.

Petitioner also objects to the prosecutor's questioning him about his plea of not guilty in the Southfield case, even though he'd been caught in the act, (Transcript at 635–36), and the prosecutor's attempts to impugn the not-guilty plea in the murder case because of the earlier not-guilty plea to a crime for which he was convicted. What petitioner's brief fails to mention is that in connection with his other convictions his own attorney had asked him why he pleaded guilty in those cases (the answer was, "because I was guilty"). (Transcript at 611–13). The defense thus opened the door to these inquiries. In addition, the defense did not object to the cross-examination and the defendant had and took the opportunity to explain why he pleaded not guilty in the Southfield case (his attorney advised him that he was guilty only of attempt). (Transcript at 635).

Petitioner argues that this Court should overlook the failure to object to these incidents because:

> The failure of Hayton's attorney to interpose additional objections as these repeated instances of excessive prosecutorial zeal arose certainly is understandable after the trial judge twice denied his mistrial and severance motions made in response to the exposure of material to the jury that was the same and similar to those matters involved in the prosecutor's cross-examination.

Brief at 73.

However, the trial judge had been willing to strike irrelevant (Transcript at 258) and prejudicial (Transcript at 221) testimony. The Court cannot assume

that the trial judge would have been unwilling to continue to control the prosecutor.

Finally petitioner argues that the prosecutor's expression of an opinion as to the guilt of the defendant, coupled with certain other features of the trial gave the impression that the prosecutor had additional evidence upon which he was basing this opinion which the jury had not heard. Intertwined with this argument is the claim that the prosecutor appealed to local prejudice against the petitioner.

Late in his rebuttal argument the prosecutor says:

> [Petitioner's trial counsel] tells you he feels strongly about this case. Well, I feel strongly about the case too. A man got killed in coldblood; a second young boy nearly got it. Just because they were a poor shot, he didn't. I am the Prosecutor; I don't like murders in our County, and when we have them, I feel strongly about them, just as strongly as [the defense lawyers] do. I usually don't get up and say what I think, but they have been doing it, and I think we have got the right guys; I know we have. They come in, they bungled the job; their own attorney said they did. An eyewitness sat there and told you that he identified them, he saw them. I know there is no pockmark on Jimmy Hayton's face, and George didn't say that. He said just something different, and you look, there is something in that cheek parts. It is not like me, with a bald head and broken nose—I would be real easy to identify, but some of you people, you don't—just like George said, there is something different, and there is. You get up and look. There is no pockmarks, and he didn't say there was, just because we put it on a flyer.

(Transcript at 798).

The statement was made in the context of discussion of defense counsel's argument and evidence adduced at the trial. There was no objection to this statement and the judge does not refer to it.

The assertion that the prosecutor led the jury to think that he had other evidence of petitioner's guilt are very weak. The detective in charge of the case mentions that he took a three-day trip with the prosecutor to Columbus, Ohio and West Virginia. (Transcript at 260). The prosecutor elicited testimony from petitioner that he had traveled from Michigan to Columbus to West Virginia. (Transcript at 623). The prosecutor mentions the rumor that one of the guns used in the Southfield robbery had been stolen in Columbus, (petitioner had "heard" but did not "know" that, Transcript at 623), and the prosecutor attempts to explain the lack of physical evidence by the length of time available to the perpetrators to dispose of their incriminating evidence. (Transcript at 749).

The implication is considerably less clear that the prosecutor had other evidence than in those cases in which federal courts have concluded that the prosecutors opinion required overturning a conviction. See, e. g., *McMillian v. United States*, 363 F.2d 165 (5th Cir. 1966). Petitioner cites no habeas corpus cases in which remarks like those in this case has been found to merit overturning a conviction. In addition, given the vagueness of the implication, the failure of defense counsel to object precludes reversal. See *United States ex rel. Satz v. Mancusi*, 414 F.2d 90, 92 (2d Cir. 1969):

> Finally, where, as here, the comments are at most ambiguous, an instruction to the jury will suffice to avoid possible prejudice. It is appropriate, therefore, to require counsel to make an immediate objection and request curative instructions. Since counsel did not do this but merely moved for a mistrial at the conclusion of the summations, appellant is precluded from raising the issue now.

Quoting *United States v. Nasta*, 398 F.2d 283, 285 (2d Cir. 1968). See also *United States ex rel. Kirk v. Petrelli*, 331 F.Supp. 792, 796 (N.D.Ill.1971).

There are insinuations throughout petitioner's brief that the prosecution was

characterizing the petitioner as an "outsider". There is almost no citation to the transcript to support this claim and perhaps the clearest illustration is in the prosecutor's argument talking about them "coming in" and bungling the job. The cases which the petitioner cites are so much more horrendous examples of prejudice toward a group of which the defendant was a member that they simply do not constitute authority for petitioner's position. Since petitioner is white there is no veiled reference to race.

Thus, the Court concludes that even with all of the claimed items of prosecutorial misconduct considered as a whole, petitioner's federal constitutional rights were not violated by the conduct of the prosecution.

As noted earlier, this case presented complex and difficult issues. As is indicated by a number of cases cited in this opinion and in petitioner's briefs, a strong argument can be made that Michigan law would entitle petitioner to a new trial. However, a federal court's role in considering a petition for a writ of habeas corpus is quite limited. Trial errors are grounds for issuance of the writ only if they rise to constitutional magnitude. *Manning v. Rose*, 507 F.2d 889 (6th Cir. 1974); *Burks v. Egeler*, 512 F.2d 221, 226 (6th Cir. 1975):

> In contrast to direct appellate review of cases originally tried in a federal court, where nonconstitutional error can be and is often corrected, habeas corpus relief can only be afforded where the error claimed to have been committed in a state court system is of federal constitutional dimensions.

As the Supreme Court said in *Cupp v. Naughten*, 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973), in discussing a challenge to a state court's use of a "presumption of truthfulness" instruction:

> Before a federal court may overturn a conviction resulting from a state trial in which this instruction was used, it must be established not merely that the instruction is undesirable, erroneous, or even "universally condemned,"

but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment.

414 U.S. at 146, 94 S.Ct. at 400.

Using this standard, the Court cannot say that the matters presented by this petition indicate a denial of Fourteenth Amendment rights, and accordingly, the Petition for Writ of Habeas Corpus is denied, and Respondent's Motion to Dismiss is granted.

It is so ordered.